**UNITED STATES of America, ex rel. STINSON, LYONS, GERLIN & BUSTAMANTE, P.A., Appellant**

v.

**The PRUDENTIAL INSURANCE COMPANY.**

No. 90–5445.

United States Court of Appeals, Third Circuit.

Argued Nov. 8, 1990.

Decided Sept. 18, 1991.

Rehearing and Rehearing In Banc Denied Oct. 10, 1991.

Luis C. Bustamante (argued), Tracy E. Tomlin, Stinson, Lyons, Gerlin & Bustamante, P.A., Miami, Fla., for appellant.

William G. Kopit (argued), of counsel, Robert J. Moses, Robert E. Turtz, Epstein Becker & Green, P.C., Washington, D.C., for appellee.

Before SLOVITER, Chief Judge *, SCIRICA and SEITZ, Circuit Judges.

OPINION OF THE COURT

SLOVITER, Chief Judge.

This appeal from the district court's dismissal of a complaint for lack of subject matter jurisdiction requires us to interpret the jurisdictional bar provisions of the False Claims Act, 31 U.S.C. §§ 3729–3733 (1988) (FCA). The law firm of Stinson,

---

* Hon. Dolores K. Sloviter became Chief Judge on February 1, 1991.

Lyons, Gerlin & Bustamante, P.A. (Stinson) filed this action on behalf of the United States against Prudential Insurance Company alleging that Prudential defrauded the Government by avoiding its statutory responsibility to pay certain insurance claims as the primary insurer. The district court dismissed the complaint on the ground that it lacked subject matter jurisdiction because the action was based solely on information or allegations that had been publicly disclosed in previous litigation. We have jurisdiction over Stinson's timely appeal under 28 U.S.C. § 1291 (1988).

## I.

### Facts and Procedural History

Stinson learned of Prudential's allegedly fraudulent activity during its representation of T. Armlon Leonard in 1983 in connection with injuries sustained by Leonard in an automobile accident. Leonard, who was 67 years old at the time of the accident, was covered by a group insurance plan provided by his employer and carried by Provident Life and Accident Insurance Company (Provident).

In the course of processing Leonard's claim against Provident, Stinson formed a suspicion that Provident's claim processing practice was in violation of federal law, specifically the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub.L. No. 97–248, § 116(b), 96 Stat. 324, 353 (1982), in which Congress shifted primary liability for benefit claims of people covered both by Medicare and employer group health plans (working seniors) from Medicare to the private group plan. Stinson believed that, notwithstanding TEFRA, Provident was avoiding its responsibility by allowing Medicare to continue to pay as the primary insurer the benefit claims of Armlon and other working seniors.

Provident filed suit against Leonard in the Circuit Court for Dade County, Florida, seeking a declaratory judgment establishing the legality of its claim procedure. *Provident Life & Accident Ins. Co. v. Leonard*, No. 85–10113 CA(15) (Fla. Dade County Cir.Ct.) (the *"Leonard* litigation"). Through discovery in the *Leonard* litiga-

tion, Stinson obtained two internal Provident memoranda, admittedly hearsay, which Stinson reads as suggesting that other insurance companies had similar claim processing practices.

The first document contained the results of a Provident telephone survey of the claim processing practices of other insurance companies with respect to working seniors. Next to the name "Arthur M. Wood, Vice President, Prudential Insurance Company" appears the handwritten notation, "Left message—Same as us." App. at 81. The notation is unsigned, and there is no indication who asked the question or who prepared the document. The second document, a Provident memorandum entitled "Policy Issue Medicare Reimbursement" which recommended that Provident change its claim processing procedure, repeated the same notation, "Prudential—Same as us," under the heading "Input," apparently on the basis of the earlier memorandum. App. 400. According to Stinson's affidavit, it filed these memoranda with the Florida court on October 6, 1986, eleven days after obtaining them from Provident.

In early 1988, a year and a half later, Stinson brought an action on behalf of the United States against Provident under the *qui tam* provisions of the False Claims Act (FCA). *See United States ex rel. Stinson, et al. v. Provident Life & Accident Ins. Co.*, 721 F.Supp. 1247 (S.D.Fla.1989). Thereafter, Stinson filed identical actions against Prudential and the other insurance companies allegedly implicated by the Provident memoranda. *See United States ex rel. Stinson et al. v. Provident Life & Accident Ins. Co.*, CIV 1–89–331 (E.D.Tenn.); *United States ex rel. Stinson et al. v. Blue Cross Blue Shield of Ga., Inc.*, 755 F.Supp. 1040 (S.D.Ga.1990); *United States ex rel. Stinson et al. v. Pilot Life Ins. Co.*, C–90–29–G (M.D.N.C.); *United States ex rel. Stinson et al. v. Pan American Life Ins. Co.*, No. 90–411 (E.D.La.). In each case, Stinson argued that the insurance company defrauded the government by allowing Medicare to pay as primary insurer for claims of working seniors.

As required by the FCA, 31 U.S.C. § 3730(b)(2), Stinson disclosed the information on which the claim against Prudential was based to the United States. The Government declined to intervene, and Stinson proceeded with the action. Prudential moved for dismissal under Rule 12(b)(1) asserting that the law firm did not qualify as a proper *qui tam* plaintiff.[1]

The district court dismissed the complaint, finding that it did not have subject matter jurisdiction. *United States ex rel. Stinson, et al. v. Prudential Ins. Co.*, 736 F.Supp. 614 (D.N.J.1990). The district court relied on the FCA's jurisdictional bar contained in 31 U.S.C. § 3730(e)(4)(A), which precludes suits based on, *inter alia*, the "public disclosure" of allegations or transactions in a civil "hearing," unless the *qui tam* plaintiff is an "original source" of the information.

The district court held that Stinson's *qui tam* action was based solely on the Provident memoranda which had been publicly disclosed for purposes of the jurisdictional bar of the FCA when they were obtained by Stinson through civil discovery. *Stinson*, 736 F.Supp. at 618–19, 622. The court held that Stinson was not an "original source" because its suit was based exclusively on the information contained in the Provident memoranda, and thus its knowledge of Prudential's allegedly fraudulent practice was neither direct nor independent of the public disclosure. *Id.* at 622–23.

1. Prudential also sought dismissal pursuant to Fed.R.Civ.P. 9(b). In light of our disposition of this case, we need not address whether fraud was plead with sufficient particularity.

2. As noted in *Erickson v. American Institute of Bio. Sciences,* 716 F.Supp. 908, 909 n. 1 (E.D.Va. 1989), *"qui tam"* is taken from the Latin expression *qui tam pro domino rege quam pro se ipso in hac parte sequitur,* meaning "who brings the action for the king as well as for himself." *See* W. Blackstone, Commentaries on the Law of England 160 (1768).

3. The same statutory section contains other jurisdictional bars, inapplicable here, which provide:

(e) Certain actions barred.—(1) No court shall have jurisdiction over an action brought by a former or present member of the armed forces under subsection (b) of this section

We have plenary review of the district court's dismissal of the complaint for lack of subject matter jurisdiction. *See York Bank & Trust Co. v. Federal Sav. and Loan Ins. Corp.*, 851 F.2d 637, 638 (3d Cir.1988), *cert. denied*, 488 U.S. 1005, 109 S.Ct. 785, 102 L.Ed.2d 777 (1989).

## II.

### *The False Claims Act and Its History*

#### A.

#### *The Act*

The FCA provides penalties for persons who knowingly submit fraudulent claims to the Government. Civil actions may be brought by the Government or, in certain circumstances, by a private plaintiff (*qui tam* plaintiff)[2] on behalf of the Government. Before proceeding with the suit, the *qui tam* plaintiff must disclose the information on which the claim is based to the Government, and the Government has sixty days to intervene. 31 U.S.C. § 3730(b). If the Government does not intervene, the *qui tam* plaintiff may proceed with the action unless the information on which the claim is based triggers one of the jurisdictional bars contained in section 3730(e). *Id.* § 3730(e).

The issue in this appeal is whether Stinson's suit is barred by section 3730(e)(4)[3] which provides:

against a member of the armed forces arising out of such person's service in the armed forces.

(2)(A) No court shall have jurisdiction over an action brought under subsection (b) against a Member of Congress, a member of the judiciary, or a senior executive branch official if the action is based on evidence or information known to the Government when the action was brought.

(B) For purposes of this paragraph, "senior executive branch official" means any officer or employee listed in section 1 paragraphs (1) through (8) of section 101(f) of the Ethics in Government Act of 1978 (5 U.S.C.App.).

(3) In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.

31 U.S.C. § 3730(e)(1)–(3)

(4)(A) No court shall have jurisdiction over an action under this section based upon the *public disclosure* of allegations or transactions in a criminal, *civil,* or administrative *hearing,* in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an *original source* of the information.

(B) For purposes of this paragraph, "original source" means an individual who has *direct and independent* knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A)–(B) (emphasis added).

Stinson argues that the district court erred as a matter of law in holding that jurisdiction was barred. It contends that (1) its receipt of the Provident memoranda in civil discovery was not a public disclosure in a civil hearing for purposes of section 3730(e)(4); (2) the jurisdictional bar applies only to public disclosures made by the government; and (3) even if the memoranda were publicly disclosed, Stinson was an original source to information other than that contained in the Provident memoranda. Before turning to the language of the amended FCA, we consider the history of the Act to understand the need for and purpose of the 1986 amendment.

## B.

### *Earlier Versions*

The False Claims Act was adopted in 1863 in response to rampant fraud by Civil War defense contractors. The original Act provided for criminal and civil penalties, including payment of double the amount of damages suffered by the government and a $2,000 forfeiture. The Act contained a broad *qui tam* provision allowing any person to prosecute a claim on behalf of the United States against any person who knowingly submitted a false claim to the Government. *See* S.Rep. No. 345, 99th Cong., 2d Sess. 8–10, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5266, 5273–75. If successful, the *qui tam* plaintiff, or relator, was entitled to half of the damages and forfeitures recovered under the Act.

In the 1940's, a number of *qui tam* actions were brought by individuals with no independent knowledge of the fraud, some of whom learned of the fraud through the inspection of government criminal indictments. *Id.* at 10, U.S.Code Cong. & Admin.News at 5275. In *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), the Supreme Court held that under the Act a relator could bring a *qui tam* action based solely on information derived from a government criminal indictment. In finding that the Act did not require that a *qui tam* plaintiff contribute new information to the discovery of the fraud, the Court looked to the broad language of the Act ("Suits may be brought and carried on by any person," *id.* at 546, 63 S.Ct. at 385), and to the legislative history ("even a district attorney, who would presumably gain all knowledge of a fraud from his official position, might sue as the informer," *id.* (citing Cong.Globe, 37th Cong., 3d Sess., 955–56)).

Congress reacted immediately to the *Marcus* decision by amending the FCA in 1943. The House passed a bill that would have repealed the FCA. The Senate bill, as originally approved by that chamber, barred jurisdiction where a *qui tam* suit was based on information in the possession of the Government unless the information on which the suit was based was "original with such person." 89 Cong.Rec. 510,744 (daily ed. Dec. 16, 1943). The Senate version was adopted, but the original source exception was dropped in conference. Thus, the FCA as amended in 1943 denied jurisdiction over *qui tam* actions that were "based on evidence or information the government had when the action was brought." 31 U.S.C. § 3730(b)(4) (1982) (superseded).

This language was broadly construed by courts to bar jurisdiction whenever the

Government possessed the information on which the claim was brought, even when the information had been provided to the Government by the *qui tam* plaintiff before the filing of the claim. The decision evoking the most reaction was *United States ex rel. Wisconsin v. Dean*, 729 F.2d 1100, 1106 (7th Cir.1984), holding that the district court had no jurisdiction over a *qui tam* action brought by Wisconsin based on information of Medicaid fraud the state had uncovered because the state had reported the Medicaid fraud to the federal government as required under the Act. *See also United States v. Aster*, 275 F.2d 281 (3d Cir.), *cert. denied*, 364 U.S. 894, 81 S.Ct. 223, 5 L.Ed.2d 188 (1960). The National Association of Attorneys General promptly adopted a resolution strongly urging Congress "to rectify the unfortunate result" of that decision which was viewed as unnecessary inhibiting the detection and prosecution of fraud on the government. S.Rep. No. 345, 99th Cong., 2d Sess. 13, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5278.

### C.

### *The 1986 Amendment*

In reaction to these restrictive interpretations and in light of the belief that the Government lacked the resources to adequately address the growing problem of fraud upon the Government, Congress amended the FCA in 1986 in order to "encourage more private enforcement suits." *Id.* at 23–24, 1986 U.S.Code Cong. & Admin.News 5288–89. To revitalize the *qui tam* provisions, the amendment provided incentives for private enforcement, including increased monetary awards, adopted a lower burden of proof, and allowed the *qui tam* plaintiff to remain a party in the action even if the Government intervenes.

The bill that eventuated in the 1986 amendments underwent substantial revisions during its legislative path. This provides ample opportunity to search the legislative history and find some support somewhere for almost any construction of the many ambiguous terms in the final version. We look instead to what we can glean from the principal intent, which was to have the

*qui tam* suit provision operate somewhere between the almost unrestrained permissiveness represented by the *Marcus* decision, *see id.*, and the restrictiveness of the post–1943 cases, which precluded suit even by original sources. *See* Oparil, *The Coming Impact of the Amended False Claims Act*, 22 Akron L.Rev. 525, 549 (1989) ("Clearly, the purpose of the amendment was to retain the 1943 Amendment's bias against parasitic lawsuits."); Brody, *Recent Developments in the Area of "Qui Tam"*, 592, 595 Fed.Bar & News J. (Dec. 1990) ("One of the principal goals of barring *qui tam* actions based on public disclosures is to prevent the 'parasitical' or 'copycat' lawsuit."). *False Claims Act Implementation: Hearing Before the Subcomm. on Admin. Law and Gov. Relations of the House Comm. on the Judiciary*, 101st Cong., 2d Sess. 3 (1990) [hereinafter *1990 Implementation Hearing*] (1986 amendment "sought to resolve the tension between ... encouraging people to come forward with information and ... preventing parasitic lawsuits") (statement of Sen. Grassley).

One theme recurring through the legislative history in 1985 is the intent to encourage persons with first-hand knowledge of fraudulent misconduct to report fraud. Congress sought to stop the "conspiracy of silence" among employees of corporations engaging in fraud. *See* S.Rep. No. 345, 99th Cong. 2d Sess. 6, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5271. The Senate Report stresses that in order to detect fraud it was necessary to enlist the "cooperation of individuals who are either close observers or otherwise involved in the fraudulent activity." *Id.* at 4, U.S.Code Cong. & Admin.News 5269. We will therefore proceed to examine the statutory language at issue in light of this general intent underlying passage of the 1986 amendment.

### III.

### *Discussion*

### A.

### *What Kind of "Hearing"?*

■ We begin with an analysis of Stinson's claim that the reference in the statu-

tory jurisdictional bar to a civil "hearing" is not broad enough to encompass a civil "proceeding" or civil litigation. If Stinson is correct, we need make no further inquiry because the only bar of section 3730(e)(4)(A) conceivably relevant here is that applicable if the information on which the *qui tam* action is brought was publicly disclosed in a civil hearing. *See United States ex rel. Leblanc v. Raytheon Co.*, 913 F.2d 17, 20 (1st Cir.1990) (the jurisdictional bar of § 3730(e)(4)(A) is triggered only where information or allegation was disclosed "in a criminal, civil or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit ..."), *cert. denied,* —— U.S. ——, 111 S.Ct. 1312, 113 L.Ed.2d 246 (1991); *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1499 (11th Cir. 1991) (same).

The statute does not define the words "civil hearing." "Hearing" is defined by Black's Law Dictionary as a "[p]roceeding of relative formality (though generally less formal than a trial), generally public, with definite issues of fact or of law to be tried, in which witnesses are heard and parties proceeded against have right to be heard." *Black's Law Dictionary*, at 649 (5th ed. 1979). Drawing on this definition, Stinson argues that civil hearing should be defined as "some sort of live, relatively formal proceeding before a decisionmaking body, with question of law or fact to be tried." At least one district court has agreed with Stinson. *See United States ex rel. Stinson v. Blue Cross Blue Shield*, 755 F.Supp. 1040, 1050 (S.D.Ga., 1990) ("hearing" cannot be read to include discovery requests); *see also United States ex rel. Stinson v. Provident Life & Acc. Ins. Co.*, 721 F.Supp. at 1256 ("It seems that Congress was very specific in choosing the appropriate wording of the statute given the problematic history of *qui tam* jurisdictional issues.") (dictum).

Stinson's definition of hearing is unpersuasive because, *inter alia*, it would exclude the very public disclosure at issue in *Marcus, i.e.*, disclosure of information in a criminal indictment. Only if the criminal "hearing" to which subsection (e)(4)(A) re-

fers is broad enough to cover the full range of proceedings in the course of civil, criminal, or administrative litigation would the type of lawsuit represented by *Marcus* and deemed parasitic by Congress be barred.

Stinson seeks to avoid this anomalous result by suggesting that because "[c]riminal indictments are filed as a result of a grand jury investigation and hearings," the language in section 3730(e)(4)(A) referring to " 'public disclosures ... in a criminal ... hearing' would preclude *qui tam* jurisdiction based on allegations or information contained in criminal indictments." Appellant's Reply Brief at 16. This argument is unconvincing because it is predicated on grand jury proceedings, which themselves are not public. Thus, unless the indictment is encompassed within the term "criminal ... hearing," the result in *Marcus* will stand and suit can be brought on information from an indictment.

Moreover, it is unlikely that Congress sought to draw a distinction for purposes of a *qui tam* action between knowledge learned by a potential relator through an indictment and through an information which, in contrast to an indictment, is not preceded by a grand jury proceeding. *See* Fed.R.Crim.P. 7. We decline to adopt a definition of hearing that is inconsistent with the legislative purpose. "In determining the meaning of a statute, we look not only to the particular statutory language, but to the design of the statute as a whole and its object and policy." *Crandon v. United States*, 494 U.S. 152, ——, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990).

We note also that in other civil contexts the term "hearing" does not necessarily take the form of a live, formal proceeding. Fed.R.Civ.P. 56(d), for instance, refers to "the hearing of the motion" for summary judgment, but we have held that "hearing" in Rule 56 does not require that an oral hearing be held before judgment is entered. *See Anchorage Assoc. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 176 (3d Cir.1990).

We read section 3730(e)(4) as designed to preclude *qui tam* suits based on information that would have been equally available to strangers to the fraud transaction had

they chosen to look for it as it was to the relator. Information gleaned in litigation and on file in the clerk's office falls in this category. The language precluding suits based on information in hearings must be read in conjunction with the other sources *in pari materia,* such as a Government Accounting Office report, hearing, audit, or investigation. There would have been no reason to bar *qui tam* suits by persons who learned the information through reading a Government report purchased from the Government Printing Office or available in a public library but permit such suits if the information was learned through reading court records. We believe, instead, that "in the course of a civil, criminal, or administrative hearing" should be interpreted broadly to include allegations and information disclosed in connection with civil, criminal, or administrative litigation.

Stinson argues that this broad construction of "hearing" renders subsection (e)(3) redundant. Section 3730(e)(3) provides: "[i]n no event may a person bring [a *qui tam* action] which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party." 31 U.S.C. § 3730(e)(3). Stinson contends that if "civil hearing" is read to include civil proceedings encompassing discovery and the filing of a complaint with the court, there was no reason for Congress to include a specific section dealing with cases in which the government was a party. According to Stinson, those cases would be subsumed in subsection (e)(4). This construction should be avoided, Stinson contends, because "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." 2A Sutherland, *Statutory Construction* § 46.06, at 104 (4th ed. 1984) (footnotes omitted); *see United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955) (In statutory construction, courts must " 'give effect, if possible, to every clause and word of a statute,' . . . rather than to emasculate an entire section.")

Although there is some initial plausibility in Stinson's argument, closer analysis shows that Stinson misapprehends the reach of subsection (e)(3). Subsection (e)(3) precludes private plaintiffs from bringing suits based on information or allegations that are the subject of a suit in which the government is a party, but it, unlike subsection (e)(4), applies that preclusion even if the private plaintiff was the original source of the information ("In no event may a person bring an action . . ."). Thus, had the government filed a false claims action against Prudential, Stinson's *qui tam* action against Prudential would be barred *ab initio.* Therefore, we cannot agree with Stinson that interpreting the ambiguous term "hearing" in subsection (e)(4) to encompass the full scope of litigation makes subsection (e)(3) redundant. The subsections are obviously addressed to different situations. The fact that there may be some overlap is inconsequential.

■ Stinson also asserts that our reading of "hearing" is at odds with the legislative history. An earlier version of section 3730(e)(4) would have barred jurisdiction over actions based on "specific evidence or specific information the Government disclosed as a basis for allegations made in a prior administrative, civil, or criminal *proceeding.*" S. 1562, 99th Cong. 1st Sess. § 2 at 3 (1985) (emphasis added). In a later version of the bill, the term "proceeding" was replaced with "hearing." As a general rule, "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *See Russello v. United States,* 464 U.S. 16, 23–24, 104 S.Ct. 296, 300–301, 78 L.Ed.2d 17 (1983).

This tenet of statutory construction is not inviolable, and its application in this case is not warranted. First, the legislative history does not reveal what Congress intended by the substitution, and the substitution of "hearing" for "proceeding" was part of a revision which expanded the jurisdictional bar by deleting the requirement that the disclosure be made by the government. For similar reasons, we cannot give any significance to Congress's use

of the different terms "civil suit" and "administrative ... proceeding" in subsection (e)(3). The plain fact is we have no explanation and it is just as plausible in this context to read "suit," "proceeding," and "hearing" interchangeably as it is to define "hearing" in the crabbed way Stinson posits. Second, defining "hearing" narrowly would lead to arbitrary results. For example, a court would have jurisdiction over a suit based on information first learned by a lawyer at a deposition over which a judge presided (which may occur in some multiparty litigation because the parties have been unable to cooperate) but jurisdiction would be barred if the disclosure occurred when the judge was not present. Finally, and most persuasively, there is no indication that in dropping the term "hearing" Congress intended to allow the types of suits represented in *Marcus.* As Justice Jackson wrote in his dissent in *Marcus,*

> All laws are to be given a sensible construction; and a literal application of a statute, which would lead to absurd consequences, should be avoided whenever a reasonable application can be given to it, consistent with the legislative purpose.

*United States ex rel. Marcus v. Hess,* 317 U.S. at 557, 63 S.Ct. at 390 (Jackson, J. dissenting) (quoting *United States v. Katz,* 271 U.S. 354, 357, 46 S.Ct. 513, 514, 70 L.Ed. 986 (1926)).

We therefore construe a civil "hearing" as used in subsection (e)(4)(A) to encompass the full range of proceedings in a civil lawsuit such as that represented by the *Leonard* litigation. That, of course, does not alone dispose of the jurisdictional bar issue; we must next decide whether Stinson's *qui tam* action was based on a "public disclosure" of allegations in that litigation.

## B.

### *Were the Provident Memoranda "Publicly Disclosed"?*

Stinson's principal argument on appeal challenges the district court's conclusion that the Provident memoranda which refer to Prudential were publicly disclosed when they were produced by Provident to Stinson during discovery in the *Leonard* litigation. Stinson cites *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), for the general proposition that discovery is not a public component of litigation.

*Seattle Times* involved claims of defamation and invasion of privacy brought by a religious organization and its spiritual leader against the Seattle Times newspaper. The Washington state court entered a protective order pursuant to the state analog to Rule 26(c) of the Federal Rules of Civil Procedure [4] prohibiting the newspaper from disseminating or using information it discovered from the religious group regarding membership and donations, except in ways necessary to prepare its defense. The Seattle Times challenged the protective order as violative of its First Amendment rights. The Court commented that discovery is "a matter of legislative grace," *id.* at 32, 104 S.Ct. at 2207, and that "[s]uch proceedings were not open to the public at common law," *id.* at 33, 104 S.Ct. at 2208. It rejected the newspaper's contention that a protective order entered after a showing of good cause offends the First Amendment.

There is an ongoing debate over whether the public should have access to discovery and settlement negotiations. *See, e.g.,* Miller, *Private Lives or Public Access,* 77 ABA Journal 64 (August 1991). The issue whether there is a "right" to public access to discovery material produced in connection with litigation, such as that considered in *Seattle Times,* is not implicated here. Instead, here we focus on the characterization of the discovery once it has been produced, and whether a person who acquires such material has received it through a "public disclosure" for purposes of the FCA.

---

**4.** Fed.R.Civ.P. 26(c) provides that "[u]pon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."

A protective order will be granted only after the court is satisfied that good cause exists for issuance of the order. *See Smith v. BIC Corp.*, 869 F.2d 194, 199 (3d Cir.1989); *Cipollone v. Liggett Group, Inc.*, 822 F.2d 335, 343 (3d Cir.), *cert. denied*, 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987). Once the court has determined that there is no reason to shield discovery by a protective order, the arguments in favor of a more restrictive access to discovery materials become irrelevant.

We must assume from the absence of a protective order that the information disclosed in discovery is potentially accessible to the public. Indeed, several courts of appeals have so held, relying on the "good cause" requirement of Rule 26(c). *See In re "Agent Orange" Product Liability Litigation*, 821 F.2d 139, 145 (2d Cir.), *cert. denied, Dow Chemical Co. v. Ryan*, 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987) ("[I]f good cause is not shown, the discovery materials in question should not receive judicial protection and therefore would be open to the public for inspection."); *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775 (1st Cir.1988) ("Unless the public has a presumptive right of access to discovery materials, the party seeking to protect the materials would have no need for a judicial order since the public would not be allowed to examine the materials in any event."), *cert. denied*, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989); *American Telephone & Telegraph Co. v. Grady*, 594 F.2d 594, 596 (7th Cir.1978) ("As a general proposition, pretrial discovery must take place in the public unless compelling reasons exist for denying the public access to the proceedings.

F.R.Civ.P. 26(c)."), *cert. denied*, 440 U.S. 971, 99 S.Ct. 1533, 59 L.Ed.2d 787 (1979).

■ In this case, we need not consider whether information subject to a protective order which is either advertently or inadvertently disclosed could be considered to be received pursuant to a "public disclosure." There was no reason to shield from public access the information referring to Prudential appearing in the Provident discovery, and Stinson does not suggest any. Therefore, disclosure of discovery material to a party who is not under any court imposed limitation as to its use is a public disclosure under the FCA.[5]

Nonetheless, Stinson draws a distinction for purposes of the FCA statute based on whether or not the discovery was filed with the court. *Compare Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775 (1st Cir. 1988) (effect of nonfiling was to deny the public the right it would otherwise have had to inspect freely the discovery materials in this case) *with Avirgan v. Hull*, 118 F.R.D. 252, 255–56 (D.D.C.1987) (holding, in reliance on "the presumption inherent in Rule 26(c) ... [that] discovery should be open," that, absent a showing of good cause, press and public had right to attend deposition of third-party deponent).

We do not think that it is significant, for purposes of interpreting the "public disclosure" provision of the FCA, whether the discovery has in fact been filed. Due to the large volume of discovery materials, many district courts have adopted local rules which provide that discovery materials should not be filed with the court except by order of the court.[6] Such local rules do not generally preclude access by interested persons to nonfiled material. In fact, the Local Rules of some district

---

5. We also reject summarily the law firm's contention that subsection (e)(4)(A) addresses only those public disclosures made by the government. Even if this argument had been properly preserved, which Prudential denies, nothing in the statutory language restricts the term "public disclosure" to those made by the government. An earlier version of the Act would have limited the jurisdictional bar to disclosures made by the government, but this language was deleted in favor of a more expansive bar. In the absence of convincing legislative history or statutory purpose, we cannot ignore the plain and unam-

biguous words of the statute, which plainly includes disclosures made by a private party. *See Smith v. Fidelity Consumer Discount Co.*, 898 F.2d 907, 910 (3d Cir.1990).

6. *See, e.g.*, Federal Local Court Rule 40(a) (W.D.Pa.) ("Pursuant to Rule 5(d) of the Federal Rules of Civil Procedure, depositions, interrogatories, requests for admissions, and answers and responses thereto shall *not* be filed with the Clerk's Office except by order of the court.").

courts provide that the court may order the filing of discovery materials at the request of any person who has an interest in reviewing the materials.[7]

Fed.R.Civ.P. 5(d) continues to require filing of discovery material in the absence of a court order excusing filing.[8] The Advisory Notes to Rule 5 explain that in 1978 the Committee considered adopting a rule that discovery materials would not be filed unless the court ordered their filing, but retained the rule requiring filing because "such materials are sometimes of interest to those who may have no access to them except by a requirement of filing, such as members of a class, litigants similarly situated, or the public generally." Fed. R.Civ.P. 5(d) advisory committee note to 1980 amendment; *see In re Agent Orange Product Liability Litigation*, 821 F.2d 139, 146 (2d Cir.1987).

Moreover, a distinction based on actual filing *vel non* would in many instances make application of the "public disclosure" provision depend upon the form of discovery. It is not uncommon for parties in districts which do not have a local rule precluding filing of discovery to file answers to interrogatories but not documents disclosed in response to a request to produce under Fed.R.Civ.P. 34. Thus, in those districts, had Stinson drafted interrogatories to Provident requesting it to set forth all references in its files to the claim practice followed by other insurance companies, the information disclosed in answer to those interrogatories when filed would be information publicly disclosed whereas the same information contained in documents produced in lieu of answers to interrogatories, *see* Fed.R.Civ.P. 33(c), would not be publicly disclosed. We decline to base an interpretation of the statute on the happenstance of the manner of discovery or the local rule pursuant to which discovery is made.

Stinson argues that we should not rely on the Federal Rules of Civil Procedure because the Provident memoranda were discovered under the Florida Rules of Civil Procedure, which do not require the filing of discovery materials. *See* Fla.R.Civ.P. 1.350(d) ("Unless required by the court, a party shall not file any of the documents or things produced with the response."). We would be reluctant to base our analysis of the meaning of a federal statute on differences in the discovery rules of the various states. The definition of terms in a federal statute is a federal issue. As we noted above, we look not to whether the specific documents must be or have been filed but whether there is a recognition that they can be filed and hence available for public access. In this regard the Florida Rule is no different than some of the local district court rules discussed above. Stinson's argument based on the purported lack of accessibility to discovery under the Florida procedure is most effectively belied by the procedure actually used in this case. For reasons unexplained in this record, Stinson in fact filed the two Provident documents referring to Prudential with the Florida court clerk eleven days after it received them from Provident. The information they contained was fully available to any interested person. Stinson's *qui tam* suit against Prudential was not filed until more than two years later.

To recapitulate, the presumption under Rule 5(d) of public access to civil discovery that is not subject to a protective order leads us to conclude that information received as a result of such discovery should

---

**7.** *See, e.g.,* Rule 40(e) (W.D.Pa.) ("the court shall order discovery matter filed in the usual course of any case where *any person* shall file an affidavit with the Clerk that he has a genuine interest in reading the material") (emphasis added); Rule 24(e) (E.D.Pa.) ("The court, on its own motion, on motion by any party or *on application by a non-party,* may require the filing of the original of any discovery paper or deposition transcript.") (emphasis added).

**8.** Rule 5(d) provides:

All papers after the complaint required to be served upon a party, together with a certificate of service, shall be filed with the court within a reasonable time after service, but the court may on motion of a party or on its own initiative order that depositions upon oral examination and interrogatories, requests for documents, requests for admission, and answers and responses thereto not be filed unless on order of the court or for use in the proceeding.

be deemed based on a "public disclosure" for purposes of the FCA jurisdictional bar.[9] It follows that the jurisdictional bar of section 3730(e)(4)(A) for actions based on the "public disclosure" of allegations or transactions in a "civil hearing" is applicable because Stinson acquired the information upon which it based its *qui tam* complaint through the material produced by Provident in discovery. We must therefore decide whether Stinson's suit is saved because Stinson is "an original source of the information."

### C.

*Is Stinson an "Original Source"?*

■ The savings clause for suits brought by "original sources" was a significant feature of the 1986 amendment because, as we noted above, that amendment was precipitated by cases such as the Seventh Circuit's 1984 decision in *Wisconsin,* 729 F.2d at 1106, precluding a *qui tam* suit by Wisconsin which had itself conducted the investigation of Medicaid fraud. *See* S.Rep. No. 345 at 13, 1986 U.S.Code Cong. & Admin.News at 5278.

The statute defines "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(2)(B). As the court held in *Houck on behalf of the United States v. Folding Admin. Comm.,* 881 F.2d 494, 505 (7th Cir.1989), a relator who would not have learned of the information absent public disclosure did not have "independent" information within the statutory definition of "original source." In light of our conclusion that Provident's production of its memoranda was the public disclosure in this case, it follows that Stinson's information about the alleged fraudulent activity was not "independent" of the public disclosure.

■ Stinson argues that its action was not based exclusively on the "nebulous notation" about Prudential contained in the Provident memoranda. It contends that the other information that it possessed through its suit against Provident and its interest in and knowledge of the insurance industry gave it the background necessary to understand the complex scheme by which Prudential allegedly defrauded the government. Undoubtedly, it is not necessary for a relator to have all the relevant information in order to qualify as "independent." *See 1990 Implementation Hearing,* at 3 ("A party with knowledge of fraud against the Government ought to be able to maintain a *qui tam* action as long as he had some of the information in advance of the public disclosure.") (statement of Sen. Grassley). Nonetheless, the relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation. If the latter were enough to qualify the relator as an "original source," then a cryptographer who translated a ciphered document in a public court record would be an "original source," an unlikely interpretation of the phrase.

Moreover, Stinson's argument overlooks the significance of the conjunctive "and" in the statutory phrase "direct *and* independent" knowledge. *See Houck,* 881 F.2d at 505; *United States ex rel. Dick v. Long Island Lighting Co.,* 912 F.2d 13, 16 (2d Cir.1990). Among the various definitions of "direct" is "marked by absence of an intervening agency, instrumentality, or influence: immediate." *Webster's Third New International Dictionary* 640 (1976). Stinson's information about Prudential came through two intermediaries: the unknown Provident employee responsible for the telephone call and notation and the discovery procedure by which the memoranda were produced. Therefore, Stinson

---

**9.** Because we view the "public disclosure" as covering discovery not subject to a protective order, it is plain that Stinson's *qui tam* action is "based upon" the allegations or transactions publicly disclosed in a civil hearing. We therefore need not decide whether a public disclosure bars a *qui tam* suit by someone who acquires the information independently from the public disclosure, but who does not fit within the stringent definition of an original source.

cannot be deemed to have had "direct" knowledge of the manner in which Prudential processed its working seniors' claims.

This is in accord with the relevant case-law. In *United States v. Rockwell Int'l. Corp.*, 730 F.Supp. 1031, 1036 (D.Col.1990), the court dismissed a *qui tam* action brought by the Taxpayers Against Fraud, a nonprofit corporation, which learned about the alleged fraud from a whistleblowing insider, because the corporation had no direct and independent knowledge of the information. On the other hand, in *Houck* the court found that the relator's knowledge of the fraud by a committee processing a class action settlement was "direct" because he learned of the information upon which the claim was based "as a result of his involvement in assisting late claimants in recovering money out of the settlement order funds," 881 F.2d at 505; *cf. Provident*, 721 F.Supp. at 1258 (relator who "simply stumble[s] across an interesting court file" does not have "direct" information).

The paradigmatic "original source" is a whistleblowing insider. This covers those the Senate Report specifically referred to: "individuals who are close observers or otherwise involved in the fraudulent activity." S.Rep. No. 345, at 4, *reprinted in* U.S.Code Cong. & Admin.News 5269. Other relators may also qualify if their information results from their own investigations. However, Stinson did not obtain its information about Prudential as a result of its own investigation into that company. We therefore hold that Stinson's knowledge of the information was neither "independent" nor "direct," and it cannot be deemed an "original source." [10]

IV.

*Conclusion*

Stinson vigorously argues that this construction is inconsistent with congressional intent reflected in the 1986 amendment. To the contrary, we believe that the approach that we have taken in interpreting the jurisdictional bar is fully in accord with the congressional intent. We have given a practical, commonsense interpretation to "public disclosure," one that distinguishes between information hidden in files or disclosed in private and information produced pursuant to the discovery process which is presumptively, absent a court order, available for filing and general use. This interpretation insures that suits decried as copycat or parasitic, such as *Marcus*, will not clog the courts.

Similarly, our construction of the "original source" exception would allow *qui tam* suits to be brought by relators, such as the state of Wisconsin, whose independent investigation uncovered the information of fraud on the government. It would also allow suits by insiders, such as employees who come across information of fraud in the course of their employment. *See, e.g., United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493 (11th Cir.1991) (sustaining suit by government employee without discussion of "original source" exception); *United States ex rel. Hagood v. Somona County Water Agency*, 929 F.2d 1416 (9th Cir.1991) (same); *United States ex rel. Givler v. Smith*, 760 F.Supp. 72 (E.D.Pa.1991) (same). Moreover, because section 3730(e)(4) does not bar a *qui tam* action unless the action is based upon publicly disclosed "allegations or transactions," nothing contained here would bar suit by someone who learned of the fraud from an insider, if the information had not yet been publicly disclosed.

As we acknowledged candidly at the outset of this opinion, it is difficult to discern the congressional intent with respect to details of the statutory language. We are satisfied that our construction is in accord with the balance Congress intended in its 1986 amendment.

For the reasons set forth above, we will affirm the judgment of the district court dismissing Stinson's action as jurisdictionally barred.

10. Our construction of the "original source" exception avoids the conflict of interest issue that could arise by a lawyer arrogating to himself or herself a *qui tam* action based on information learned in the service of a client.

SCIRICA, Circuit Judge, dissenting.

Congress strengthened the qui tam provisions of the False Claims Act to encourage more people to bring to light non-public information regarding fraud. As a Senate report noted, the "overall intent in amending the *qui tam* section of the False Claims Act is to encourage more private enforcement suits." S.Rep. No. 99–345, 99th Cong., 2d Sess. 23–24 (1986) [hereinafter "Senate Report"], *reprinted in* 1986 U.S.Code Cong. & Admin.News 5266, 5288–89. This suit is barred under the majority opinion even though it could have proceeded under the restrictive pre–1986 law that Congress intended to liberalize. Because the majority's holding reduces the incentives for private citizens to act upon non-public information garnered during most phases of civil litigation, and because its interpretation of "original source" would bar many relators who voluntarily make information public, I respectfully dissent. I believe the plain language of § 3730(e)(4), and the policy underlying it, reveal that Congress did not intend to impose such restrictions on qui tam suits.

The majority finds that "public disclosure" occurred when non-public documents were handed over to a private party during privately conducted discovery, holding that whenever information not subject to a protective order is obtained through discovery during civil litigation, there has been "public disclosure in a civil hearing." It therefore finds "public disclosure" regardless of whether the information is available to the public when it is disclosed. By contrast, I would find that public disclosure did not occur until the Provident memoranda were actually disclosed to the public. Furthermore, under the majority's interpretation, Stinson cannot qualify as an "original source" because it received the information through an "intermediary." Because Stinson was itself responsible for publicly disclosing the documents, I would find that Stinson is an "original source." My interpretation of original source would not depend on how a relator obtained information prior to public disclosure. I believe this interpretation of § 3730(e)(4) is in accord with Congress' intent to encourage more qui tam actions without engendering unnecessary suits based upon information already publicly available.

## I. HISTORY OF THE FALSE CLAIMS ACT

As the majority notes, the False Claims Act was originally enacted in 1863 in response to abuses by government contractors during the Civil War. *See* Act of Mar. 2, 1863, ch. 67, 12 Stat. 696. The original statute contained broad qui tam provisions that permitted any person to prosecute a claim on behalf of the government and receive half of the amount recovered. *Id.* at §§ 4, 6, 12 Stat. 698. These provisions, however, were rarely used in the decades following their enactment.

### A. THE 1943 AMENDMENTS

In *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), the Supreme Court held that a person could maintain a qui tam action based on information copied from a government criminal indictment. The government had argued against allowing this suit, in part because an expansive reading of the qui tam provisions "might bring unseemly races for the opportunity of profiting from the government's investigations." *Id.* at 547, 63 S.Ct. at 386. The Court held that the plain language of the statute belied the government's contentions, and noted that Congress was the proper body to change or eliminate the Act's qui tam provisions. *Id.* Justice Jackson dissented, arguing that the suit should not be permitted since "[i]t is not shown that [the relator] had any original information, that he had added anything by investigations of his own, or that his recovery is based on any fact not disclosed by the Government itself." *Id.* at 558, 63 S.Ct. at 391 (Jackson, J., dissenting).

In response to the government's concerns, Congress amended the statute in 1943. *See* Act of Dec. 23, 1943, ch. 377, 57 Stat. 608; *United States v. Pittman*, 151 F.2d 851, 853–54 (5th Cir.1945) (discussing legislative history of 1943 amendments),

*cert. denied,* 328 U.S. 843, 66 S.Ct. 1022, 90 L.Ed. 1617 (1946). The government had pressed for a total repeal of the qui tam provisions, and the House of Representatives passed a bill to that effect. The Senate passed a bill that would have retained the qui tam provisions while eliminating the specific abuse involved in *Marcus.* The Senate bill would have barred actions "unless based upon information, evidence, and sources original with such person and not in the possession of or obtained by the United States in the course of any investigation or proceeding instituted or conducted by it." 89 Cong.Rec. 10744 (1943). *See also id.* at 10845 (conference report) (describing Senate proposal as barring suits based on information known to the government, unless the information was obtained from the person bringing suit). The final law adopted the Senate proposal, but without the original source language. As enacted, the 1943 law barred qui tam suits that were "based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought." 31 U.S.C. § 232(C) (1982) (superseded).

The deletion of the original source language brought about perverse results. For example, in *United States ex rel. Wisconsin v. Dean,* 729 F.2d 1100 (7th Cir. 1984), a state government was not allowed to maintain a qui tam action based on information it had gathered in its own investigations, because the state had supplied the government with the information prior to instituting its action. The court followed the weight of precedent in holding that the jurisdictional bar applied when the government has the relevant information, even when the qui tam relator was the source of that information. *Id.* at 1103. *See also Safir v. Blackwell,* 579 F.2d 742 (2d Cir. 1978), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2160, 60 L.Ed.2d 1044 (1979); *Pettis ex rel. United States v. Morrison–Knudsen Co.,* 577 F.2d 668 (9th Cir.1978); *United States v. Aster,* 275 F.2d 281 (3d Cir.), *cert. denied,* 364 U.S. 894, 81 S.Ct. 223, 5 L.Ed.2d 188 (1960).

The result was particularly harsh in *Dean,* because the state was required by another statute to submit the information to the federal government, and the federal government preferred that the state prosecute the case. In June, 1984, the National Association of Attorneys General strongly urged Congress to rectify the problem encountered in *Dean. See* Resolution III, Nat.Ass'n.Atty.Gens. (June, 1984), *reprinted in* 131 Cong.Rec. 24483 (discussed in Senate Report at 13).

## B. THE FALSE CLAIMS AMENDMENTS ACT OF 1986

As noted above, the drafters of the 1986 amendments clearly intended to overcome the restrictive effect of the 1943 amendments and expand the availability of qui tam actions. However, they also did not want to restore the opportunity to bring "parasitic" suits like that encountered in *Marcus. See, e.g.,* 132 Cong.Rec. H6483 (daily ed. Sept. 9, 1986) (statement of Rep. Bedell). *See also False Claims Act Implementation: Hearing Before the Subcomm. on Admin. Law and Gov. Relations of the House Comm. on the Judiciary,* 101st Cong., 2d Sess. 5 (1990) [hereinafter *1990 Implementation Hearing*] (1986 amendments "sought to resolve a tension between . . . encouraging people to come forward with information and . . . preventing 'parasitic' lawsuits") (Statement of Sen. Grassley).

One difficulty in interpreting the 1986 amendments is that Congress was never completely clear about what kind of "parasitic" suits it was attempting to avoid. The primary problem in *Marcus* was that the relator had acted on information developed *by the government* in its own investigations, and therefore provided the government with no new information. As the government argued in *Marcus,* such a situation creates "unseemly races for the opportunity of profiting from the government's investigations." 317 U.S. at 547, 63 S.Ct. at 386. The 1943 amendment appeared to recognize this as the main problem when it barred suits based on information *known to the government.* Stinson would most likely have been able to sue under the 1943 law, as it does not appear

that the government possessed the relevant information before Stinson filed suit.

But during the 1986 legislative process, Congress also saw a problem with suits based on certain "publicly disclosed" information, regardless of whether the government knew about the information, or acted on it. As noted below, I believe Congress felt that certain information available to the general public would likely reach the government, and consequently that qui tam suits would be unnecessary in those instances. Of course, the fact that information is "public" does not guarantee that it will find its way to the relevant government officials. But Congress seems to have decided that it is better to take this risk with respect to some publicly available information than to allow potentially unnecessary private suits.

The False Claims Amendments Act underwent various revisions before it was finally enacted. Most of the language that is disputed in this case was inserted through "technical" amendments after the bill left the Senate Judiciary Committee. I agree with the majority that legislative history of this type should not be afforded great weight. But because the final version contains a number of ambiguities, I find it useful to examine previous versions to discern the precise meaning of the final language.

1. *Bill as Introduced in Senate (August 1, 1985)*

On August 1, 1985, a bill entitled the False Claims Reform Act was introduced in the Senate. As originally proposed, the bill's relevant revisions were concerned only with those "parasitic" suits based on information disclosed by the government or the news media. The original bill contained the following language, to be codified at 31 U.S.C. § 3730(b):

> (5) Unless the Government proceeds with the action within 60 days after being notified, the court shall dismiss the action brought by the person if the court finds that—
>
> (A) the action is based on specific evidence or specific information *the*

*Government* disclosed as a basis for allegations made in a prior administrative, civil, or criminal proceeding; or

> (B) the action is based on specific information disclosed during the course of a *congressional investigation* or based on specific public information disseminated by any *news media.*

S. 1562, 99th Cong., 1st Sess. § 2, at 3 (1985) (emphasis added). Under this version, Stinson would have been able to maintain this suit, because the relevant information was not disclosed by the government or the news media.

In addition, this version allowed suits even where a specified disclosure was made, if the government failed to act after learning of the information:

> If the Government has not initiated a civil action *within six months after becoming aware of such evidence or information,* or within such additional time as the court allows upon a showing of good cause, the court shall not dismiss the action brought by the person.

*Id.* at 4 (emphasis added).

During hearings on this bill, the Justice Department objected to any revision of the existing qui tam provisions, claiming that expanding the scope of such actions would hinder government investigations. *See False Claims Reform Act: Hearing on S. 1562 Before the Subcomm. on Administrative Practice and Procedure of the Senate Comm. on the Judiciary,* 99th Cong., 1st Sess. 20–21 (1985) (testimony of Jay Stephens, Deputy Associate Attorney General). It objected in particular to the six month requirement, noting that "[t]here are several legitimate reasons why the Department might choose not to bring a civil action on the basis of information in its possession." *Id.* at 43 (statement of Jay Stephens). The Department's main concern was that expansive qui tam provisions would unduly cabin its prosecutorial discretion.

2. *Bill as Reported Out of Senate Judiciary Committee (July 28, 1986)*

The Senate Judiciary Committee addressed some of the Justice Department's

concerns, such as the potential for frivolous suits and suits filed for political motives. *See* 31 U.S.C. § 3730(d)(4) (1988) (penalties for frivolous suits); *id.* § 3730(e)(2)(A)–(B) (barring some suits against government officials). But the expanded qui tam provisions were retained when the bill was reported out of committee. Newly proposed § 3730(e) contained the following language:

(4) In no event may a person bring an action under this section based upon allegations or transactions which are the subject of a civil suit in which the Government is already a party, *or within six months* of the disclosure of specific information relating to such allegations or transactions in a criminal, civil, or administrative hearing, a congressional or Government Accounting Office report or hearing, or from the news media.

Senate Report at 43 (emphasis added).

Thus, this version allowed relators to file actions regardless of public disclosure, if the government did not act within six months. Under this language as well, Stinson could have maintained this action, because the government has declined to act. However, one problem with this version was that it provided no explicit protection for those people who provide information that is later disclosed. If the six month requirement were deleted, this omission would threaten to repeat the problem the 1943 legislation had caused with respect to information possessed by the government—a relator would be barred simply because he relayed information to others. As noted below, I believe the "original source" language was later inserted to address this concern.

The intent of the Committee is also demonstrated by proposed provisions establishing a sliding scale of fee awards to qui tam relators. The lowest level of recovery was mandated for those relators whose actions were based "solely" on the public disclosures described in proposed § 3730(e). *See* Proposed § 3730(d)(4), *reprinted in* Senate Report at 43. The accompanying Senate Report noted that this provision was designed

to prevent any "windfalls" for persons who may not have had direct involvement with investigating or exposing alleged false claims that are the basis of a *qui tam* suit, in the very limited area where the *qui tam* action is brought at least 6 months after a public disclosure, the Government has failed to act, and the suit succeeds.

Senate Report at 16, 1986 U.S.Code Cong. & Admin.News 5281. The Committee recognized that it might appear "inappropriate" to compensate such relators at all, but stated that "[t]he Committee believes a financial reward is justified in these circumstances if but for the relator's suit, the Government may not have recovered." *Id.* at 28, 1986 U.S.Code Cong. & Admin.News 5293. The Committee therefore did not adopt a strict public disclosure bar, and believed it proper to compensate relators who eventually prosecute actions based on public information.

This understanding was also shared by the House of Representatives, which on September 9 passed False Claims Act amendments with qui tam provisions similar to those in the Senate Committee version. *See* H.R. 4827, 99th Cong., 2d Sess., 132 Cong.Rec. H6474–78 (daily ed. Sept. 9, 1986). In passing this bill, the House rejected a version of the Senate bill as amended on August 11, *see infra*, which contained different qui tam language. Congressman Bedell, a sponsor of the House bill, expressed concern about "parasitic" suits, but understood this problem to refer only to actions based on information already known to the government and upon which the government intends to act:

[T]here may be many cases where evidence is somewhere in the hands of some Government official, even if the Government does not have the evidence in organized form or even knows it has the information. H.R. 4827 allows the court to dismiss a citizen's action brought upon evidence previously disclosed under certain circumstances, but also provides that the court shall permit the suit if the Government was aware of the information for 6 months and took no action.

This addresses the legitimate concern about parasitic suits.

132 Cong.Rec. H6483 (statement of Rep. Bedell). *See also* H.R.Rep. No. 99–660, 99th Cong., 2d Sess. 22–23 (1986).

### 3. *August 11 Senate Amendments*

The relatively clear understanding of the Senate Committee was unsettled by the adoption of "technical and clarifying" amendments introduced on August 11 by Senator Grassley, one of the bill's original sponsors. The amendments greatly changed the provisions at issue here. Newly proposed § 3730(e) contained the following changes:

(4) In no event may a person bring an action under this section based upon allegations or transactions which are the subject of a civil suit **or an administrative civil money penalty proceeding** in which the Government is already a party., or within six months of

(5)(A) **No court shall have jurisdiction over an action under this section** based upon the **public** disclosure of specific information relating to such allegations or transactions in a criminal, civil, or administrative hearing, a congressional, **administrative,** or Government Accounting Office report, or hearing, **audit or investigation,** or from the news media, **unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.**

(B) **For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily informed the Government or the news media prior to an action filed by the Government.**

132 Cong.Rec. 20531 (1986).

Thus, the amendment split old subsection (4) into two new subsections, one addressing civil suits involving the government and one addressing the disputed "public disclosures." The six month requirement was deleted entirely, and the "original source" language appears for the first time. In addition, the provision addressing awards to qui tam relators was changed to require the lowest recovery for those relators whose actions are based "primarily" upon publicly disclosed information, instead of "solely" as in the Committee version. *See* Proposed § 3730(d)(4), *reprinted in* 132 Cong.Rec. 20531 (1986).

Senator Grassley described these revisions as follows:

Several minor changes will be made in the qui tam section of S. 1562. Specifically, jurisdiction for qui tam actions based on information that has been publicly disclosed will be limited to those people who were "original sources" of the information....

This amendment seeks to assure that a qui tam action based solely on public disclosures cannot be brought by an individual with no direct or independent knowledge of the information or who had not been an original source to the entity that disclosed the allegations.

In the definition of "original source," the requirement that the individual "voluntarily" informed the Government or news media is meant to preclude the ability of an individual to sue under the qui tam section of the False Claims Act when his suit is based solely on public information and the individual was a source of the allegations only because the individual was subpoenaed to come forward. However, those persons who have been contacted or questioned by the Government or the news media and cooperated by providing information which later led to a public disclosure would be considered to have "voluntarily" informed the Government or media and therefore considered eligible qui tam relators.

The use of the term "Government" in the definition of original source is meant to include any Government source of disclosures cited in subsection (5)(A); that is, Government includes Congress, the General Accounting Office, any executive or independent agency as well as all other governmental bodies that may have publicly disclosed the allegations.

The amendments also limit the possible portion of the judgment recoverable by a

qui tam plaintiff to 10 percent or less when the action is based primarily on public information. This limitation will affect those persons who have brought a qui tam action based almost entirely on information of which they did not have independent knowledge but had derived from a public source.

132 Cong.Rec. at 20536.

### 4. *October 3 Senate Amendments*

On October 3, the Senate passed new amendments, which also were proposed by Senator Grassley. These amendments again made substantive changes to the relevant language, which now reached its final form. The following changes were made to the original source exception:

> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily ~~informed~~ **provided the information to** the Government ~~or the news media prior to an action filed by the Government~~ **before filing an action under this section which is based on the information**.

132 Cong.Rec. 28576 (1986). Thus, the major substantive change was that the news media was specifically dropped from the voluntary disclosure clause. It is unclear why "an action filed by the Government" was changed to one filed by the relator.

Changes were also made to the provisions involving awards to qui tam relators. *See* Proposed § 3730(d)(1), *reprinted in* 132 Cong.Rec. 28576. Senator Grassley clarified this subsection as follows:

> When the qui tam plaintiff brings an action based on public information, meaning he is an "original source" within the definition under the act, but the action is based primarily on public information not originally provided by the qui tam plaintiff, he is limited to a recovery of not more than 10 percent. In other words a 10–percent cap is placed on those "original sources" who bring cases based on information already publicly disclosed where only an insignificant amount of

that information stemmed from that original source.

*Id.* at 28580.

### 5. *House Adopts Senate Bill*

On October 7, the House adopted the Senate bill as amended. Representative Berman, one of the sponsors of the House bill, submitted "legislative history," which stated in relevant part:

> The final bill has adopted the Senate version of who may file an action under the False Claims Act. Before the relevant information regarding fraud is publicly disclosed through various *government* hearings, reports and investigations which are specifically identified in the legislation or through the news media, any person may file such an action as long as it is filed before the government filed an action based upon the same information. Once the public disclosure of the information occurs through one of the methods referred to above, then only a person who qualifies as an "original source" may bring the action. A person is an original source if he had some of the information related to the claim which he made available to the government *or the news media* in advance of the false claims being publicly disclosed. This person has the right to bring an action after these disclosures are made public as long as it is filed before an action is commenced *by the Government....*
>
> The only exception to [the] minimum 15% recovery is in the case where the information has already been disclosed and the person qualifies as an "original source" but where the essential elements of the case were provided to the government *or news media* by someone other than the qui tam plaintiff.

132 Cong. Rec. 29322 (1986) (emphasis added). This legislative history reveals that it was drafted prior to the October 3 amendments, even though the bill voted on by the House incorporated those changes. Regardless, Representative Berman appears to have understood that a plaintiff is barred only when the public disclosures

were made by the government or the news media.

## II. APPLICATION OF § 3730(e)(4) TO THIS CASE

In applying § 3730(e)(4) to this case, three questions must be addressed. First, was there a public disclosure of relevant information prior to the filing of this action? Second, if such public disclosure occurred, did it occur in a "civil hearing"? Third, if the relevant public disclosure occurred, does Stinson qualify as an original source? The majority finds that "public disclosure" occurred when Stinson first uncovered the Provident memoranda during pretrial discovery, that this disclosure occurred during a "civil hearing," and that Stinson does not qualify as an "original source." I would find that public disclosure did not occur until Stinson filed the documents with the Florida court, and that Stinson qualifies as an original source because it was responsible for this disclosure. I would not reach the issue of whether pretrial discovery constitutes a "civil hearing."

## A. PUBLIC DISCLOSURE

As the majority holds, § 3730(e)(4) applies only when information has been publicly disclosed *prior to* the filing of a qui tam action based in some part on that information. If there has been no public disclosure, then the action may proceed, provided it does not fall within any other jurisdictional bar. If there has been public disclosure, only an "original source" may bring an action.[1]

The majority holds that information is "publicly disclosed" within the meaning of § 3730(e)(4) whenever it is disclosed in litigation to a party who is under no court imposed limitation as to its use. Majority Op. at 1158. It recognizes that the Provident memoranda were not publicly available when they were disclosed to Stinson. Nevertheless, it finds public disclosure because the information might have become available to the public at some later date, if it had been obtained in federal court litigation. By contrast, I would find that information has been publicly disclosed only when it has actually been disclosed to the public. The Provident memoranda were

---

1. I agree that § 3730(e)(4) does not apply only to governmental disclosures. Although there is some indication that Congress may have contemplated such a limitation, the legislative history is not convincing enough to overcome the plain language of the statute. However, one problem with including non-governmental disclosures within § 3730(e)(4)(A) is the requirement in § 3730(e)(4)(B) that an "original source" must have "voluntarily provided the information to the Government before filing an action ... which is based on the information." There is no indication that Stinson disclosed any information relating to Prudential before filing suit. But § 3730(b)(2) requires a relator to divulge its information to the government *after* filing suit. It would be redundant to include an additional pre-filing disclosure requirement in cases involving publicly disclosed information. In these cases, a relator would have to disclose the information twice—once before filing and once after. Consequently, the "voluntary disclosure" language might be read as assuming that all public disclosures are made by the government. Under this interpretation, the language would protect people who willingly provided information to the government that the government later disclosed. Those who provided the information involuntarily, as by subpoena, would not be protected. *See* 132 Cong. Rec. 20536 (1986) (statement of Sen. Grassley),

*supra* at 1166. I believe the "voluntary disclosure" language was designed for that purpose, but that it is irrelevant in the case of non-governmental disclosures. Nevertheless, the purpose behind the language—protecting those who provide information that is later disclosed—supports the interpretation of the "original source" exception set forth below.

I also would not place any separate emphasis on the words "based upon" in § 3730(e)(4)(A). Under a literal reading, it would seem that an action involving original information which *later* was publicly disclosed would not be "based upon" any public disclosure, and could proceed regardless of whether the relator qualifies as an "original source." *See United States ex rel. La-Valley v. First Nat'l Bank,* 707 F.Supp. 1351, 1366–67 (D.Mass.1988). The problem with this interpretation is that it renders the original source exception redundant. All people who qualify as original sources would be protected by the "based upon public disclosure" language, because an original source must have "direct and independent knowledge" of the information. I believe subsection (e)(4)(A) applies to any enumerated public disclosure occurring prior to the filing of a qui tam action based in some part upon that information, regardless of whether the relator possessed the information before its disclosure. Only an "original source" can maintain a suit in these instances.

not available to the general public when Stinson obtained them, and therefore I do not believe they were "publicly disclosed" at that time. Congress believed that a qui tam incentive system is generally unnecessary when information is publicly available. But by permitting qui tam suits based upon non-public information, Congress provided incentives for private individuals to report instances of fraud which the government would not otherwise have reason to know about. I do not believe Congress intended to bar relators who obtain non-public information simply because that information might become public at a later time.

This interpretation comports with the plain language of the statute, and is supported by legislative history, case law, and sound policy concerns. The plain language of the statute is of course the most persuasive evidence of Congress' intent. The term "public disclosure" plainly refers to information available to the general public at the time of disclosure. Congress was clear about the kind of disclosure that would bar qui tam suits. The August 11 amendments specifically inserted the word "public" before the word "disclosure." *See* 132 Cong.Rec. 20531 (1986). The public disclosure bar is a limited exception to the general proposition that any person with information regarding fraud may file suit. If information has not been publicly disclosed, any otherwise eligible relator can maintain an action. *See* 132 Cong. Rec. 29322 (1986) ("Before the relevant information regarding fraud is publicly disclosed ... any person may file such an action....") (legislative history submitted by Rep. Berman).

The Court of Appeals for the Ninth Circuit recently has underscored that § 3730(e)(4) applies only to information disclosed to the general public. In *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416 (9th Cir. 1991), the relator was a government attorney who allegedly discovered fraud when he was asked to prepare a contract. Intervening on behalf of the defendant, the government contended that the suit was barred by § 3730(e)(4). It claimed that the

information learned by the relator while preparing the contract had been "publicly disclosed." The court rejected this argument. It noted that the statute was "remarkably explicit" and held that the relator "does not base his suit on any public disclosure made to him or anyone else. He bases his suit on information that he acquired in preparing the contract; the information was not publicly disclosed." *Id.* at 1419. *See also United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1500 n. 11 (11th Cir.1991) (rejecting similar argument).

Although the legislative history is not crystal clear, it supports this interpretation of the statutory language. The disclosure language was originally inserted in conjunction with the provision permitting suits based on public information if the government failed to act within six months. One rationale for the six-month requirement was that the relevant government officials may not know of some publicly disclosed information, and allowing qui tam actions after six months would ensure that the information is brought to light. *See* H.R.Rep. No. 99–660, 99th Cong., 2d Sess 22–23 (1986); 132 Cong. Rec. H6483 (daily ed. Sept. 9, 1986) (statement of Rep. Bedell).

Thus, the public disclosure language referred to information that the government would likely discover on its own. In these cases, qui tam suits would provide little to the detection of fraud, and private rewards would be unnecessary. But when the information has not been publicly disclosed, private rewards would help bring it to light. As one court has noted:

It is evident from reading § 3730(e)(4) that Congress intended to bar parasitic *qui tam* suits, that is, lawsuits based on public information. By allowing a relator to collect money for his role in a *qui tam* action, the government obviously hopes to encourage private persons to report incidents of fraud against the government. However, it will usually serve no purpose to reward a relator for bringing a *qui tam* action if the incident of fraud is already a matter of public

knowledge by virtue of "public disclosure."

*United States v. CAC–Ramsay, Inc.,* 744 F.Supp. 1158, 1159 (S.D.Fla.1990).

In this way, Congress retained the general intent behind the 1943 amendments, which barred those "parasitic" suits based on information known to the government. As discussed below, I believe the original source exception was inserted to ensure that a relator who was responsible for public disclosure would not be barred, thus avoiding the major defect of the 1943 legislation. By predicating § 3730(e)(4) on information disclosed to the general public, rather than information known to the government, Congress extended the bar somewhat.[2] However, the general purpose remained the same. When it predicated the bar on public disclosure, Congress referred to information that would likely reach the government without the incentive of a qui tam suit. I can discern no reason why Congress would be concerned about information that has not yet been disclosed to the general public.

The majority relies on the proposition that if the Provident memoranda had been disclosed in federal court litigation, they might have become available to the public after they were obtained by Stinson. It notes the general presumption under the Federal Rules of Civil Procedure that discovery materials will be available for public inspection at some point, and deems it irrelevant whether the materials have in fact been publicly filed at the time of disclosure. The majority also finds it unimportant that the production of the Provident memoranda was not governed by the federal rules upon which it relies. By contrast, I would determine whether there has been public disclosure by examining what actually occurred

in the case. I see no indication that Congress was concerned with information that might have become public if it had been obtained elsewhere.

Traditionally, pretrial discovery is not a public event. As the Supreme Court has noted with respect to the First Amendment right of access, "pretrial depositions and interrogatories are not public components of a civil trial. Such proceedings were not open to the public at common law, and, in general, they are conducted in private as a matter of modern practice." *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 33, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) (citation omitted). This was the case here. The majority relies on the Federal Rules of Civil Procedure, which provide that all discovery materials shall be filed with the court absent a contrary court order. *See* Fed.R.Civ.P. 5(d), 26(c). I agree that the federal system provides the public with a presumptive right of access to discovery materials. However, the general public has no real access to the information until it is publicly filed. *See* Fed.R.Civ.P. 5(d) advisory committee's note to 1980 amendment (Filing requirement was retained because discovery materials "are sometimes of interest to those who have no access to them except by a requirement of filing, such as ... the public generally."). If Stinson had obtained its information by browsing through public court files, I agree that the suit would have been based on public disclosure.

But the Provident memoranda were not produced in federal court, and had not been publicly filed when Stinson obtained them. When applying the term "public disclosure," I would examine the actual circumstances of this case, not those that might have existed had the information been pro-

---

2. The public disclosure language may have also narrowed the scope of the jurisdictional bar in another way. Under the 1943 legislation, government employees who discovered fraud while on the job would be barred, because the information was "known to the government." Under the 1986 amendments, however, it appears that such employees may file suit when there has been no public disclosure. *See United States ex rel. Williams v. NEC Corp.,* 931 F.2d 1493 (11th Cir.1991); *United States ex rel. Ha-*

*good v. Sonoma County Water Agency,* 929 F.2d 1416 (9th Cir.1991); *United States ex rel. Givler v. Smith,* 760 F.Supp. 72 (E.D.Pa.1991); *Erickson ex rel. United States v. American Institute of Biological Sciences,* 716 F.Supp. 908 (E.D.Va. 1989). It is possible that Congress intended this result. *See* 132 Cong.Rec. H6483 (daily ed. Sept. 9, 1986) (statement of Rep. Bedell), *supra* at 1165. But it is also possible that the omission of a government employee exception was an oversight.

duced in federal litigation. The relevant facts are those pertaining to the *Leonard* litigation, which was conducted in Florida state court. Although the meaning of "public disclosure" is a federal issue, I believe its application in a particular case must depend on the factual circumstances of the disclosure. In this case, the discovery was conducted in Florida state court. Florida state rules do not require responses to discovery requests to be filed with the court. *See* Fla.R.Civ.P. 1.350(d) ("Unless required by the court, a party shall not file any of the documents or things produced with the response."). The Provident memoranda were not filed with the court upon their production and therefore did not become a matter of public record at that time. Consequently, I believe that the information was not publicly disclosed before it was filed with the court.

I believe public disclosure did not occur until Stinson filed the Provident memoranda with the Florida court eleven days after they were produced by Provident. Section 3730(e)(4)(A) refers to public disclosure occurring at any time, regardless of whether the qui tam relator knew of the information prior to discovery. Once such public disclosure has occurred, only an "original source" can bring an action based on that information. Thus, for purposes of § 3730(e)(4)(A), I believe public disclosure occurred when the Provident memoranda were filed with the court, even though they were filed by Stinson. As noted below, however, because Stinson made the public disclosure, I believe it qualifies as an original source.

Because I would look at the facts surrounding the disclosure, my analysis might be different if the disclosure had taken a different form. For example, if Stinson had received the Provident memoranda from a witness at a public trial, rather than during pretrial discovery, such a revelation would almost certainly constitute "public disclosure in a civil hearing." However, in such a situation, Stinson might qualify as an "original source" if it was actually responsible for the disclosure of the documents, even though it did not disclose them itself. I would leave that question for another case.

I would focus on actual public disclosure, rather than the general potentiality for public access to civil litigation, and would hold that no public disclosure occurred when Stinson obtained the Provident memoranda through a discovery inquiry, just as if Stinson had obtained the same information through an independent investigation prior to the *Leonard* litigation. Non-public information, even when obtained during civil litigation, does not implicate concerns about "parasitism." I believe Congress drew the line at the point of actual public disclosure because it felt that this rule would bring the most fraud to light without engendering unnecessary suits. The soundness of this policy should be measured by its effects over the entire span of cases. But the rule is also sound as applied in this case. It is virtually impossible that the Provident memoranda would have come to light but for Stinson's efforts on behalf of its client. Stinson did not obtain this information by sifting through public records. The majority's interpretation of "public disclosure" prevents a relator from acting upon most information garnered during litigation. In my view, civil discovery is a fertile source of information relating to government fraud, and this source should not be sealed off without Congressional intent to do so. In passing the Amendments, Congress clearly intended to increase the range of permissible relators.

## B. CIVIL HEARING

Because I would hold that the production of the Provident memoranda during discovery did not constitute public disclosure, I would not reach the issue of whether civil discovery falls within the definition of a "civil hearing." The question would still remain whether the eventual filing of the information with the Florida court constituted a disclosure in a "civil hearing." Unfortunately, the record does not indicate precisely how the information was filed. Regardless, because I would find that Stinson qualifies as an "original source" with respect to this disclosure, I would assume

without deciding that the disclosure took place in a civil hearing within the meaning of § 3730(e)(4)(A).

However, I question the district court's determination that the term "civil hearing" and the other instances of public disclosures listed in § 3730(e)(4)(A) are merely "examples" of the general phrase "public disclosure." Congress was specific in the types of disclosures enumerated in that subsection, and in fact added several terms in the August 11 amendments. The False Claims Act was generally intended to expand the scope of permissible qui tam actions. Thus, § 3730(e) contains a limited list of exceptions to the general jurisdictional statement in § 3730(b) that allows any person to file a qui tam action. As one court has noted,

> The list of methods of "public disclosure" is specific and is not qualified by words that would indicate that they are only examples of the types of "public disclosure" to which the jurisdictional bar would apply. Congress could easily have used "such as" or "for example" to indicate that its list was not exhaustive. Because it did not, however, we will not give the statute a broader effect than that which appears in its plain language.

*United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1499–1500 (11th Cir. 1991). *See also* 132 Cong. Rec. 29322 (1986) ("Before the relevant information regarding fraud is publicly disclosed through various government [sic?] hearings, reports and investigations *which are specifically identified in the legislation* or through the news media, any person may file such an action. . . .") (Legislative History submitted by Rep. Berman) (emphasis added); *United States ex rel. LeBlanc v. Raytheon Co.*, 913 F.2d 17, 20 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1312, 113 L.Ed.2d 246 (1991); *Erickson ex rel. United States v. American Institute of Biological Sciences,* 716 F.Supp. 908, 912–13 (E.D.Va.1989).

## C. ORIGINAL SOURCE

An original source must have "direct and independent knowledge of the information on which the allegations are based." § 3730(e)(4)(B). The majority holds that Stinson did not have "independent" knowledge of the Provident memoranda because it received the information via "public disclosure." It also holds that Stinson did not have "direct" knowledge because it received the information through "intermediaries." It finds that an original source must have been directly involved in the transactions at issue, raising the paradigm case of the "whistleblowing insider."

I disagree with this interpretation. I believe the term "direct and independent" refers to information that is not learned by way of public disclosure. *Cf. 1990 Implementation Hearing* at 6 ("A party with knowledge of a fraud against the government ought to be able to maintain a qui tam action as long as he had some of the information in advance of the public disclosure.") (Statement of Sen. Grassley). I would find that Stinson was an "original source" because it caused the public disclosure, and would not read the word "direct" as establishing a separate jurisdictional bar. I believe the original source exception was intended to encompass at least some people who possess information prior to its public disclosure, but who do not have firsthand knowledge of the facts upon which the information is based. The primary intended beneficiaries of the original source exception are those people who provide non-public information that is later publicly disclosed, regardless of whether they had some direct involvement with the underlying factual transactions.[3]

The majority's interpretation may produce inconsistent results. Under § 3730(e)(4), any person may file suit in the absence of public disclosure. Consequently, regardless of how "original source" is interpreted, a person without a "direct" connection with the information can file

---

**3.** I also have some concerns about the majority's application of the word "independent." If I were to find that public disclosure occurred when the Provident memoranda were produced during discovery, I believe Stinson might be considered an "original source" because it was the party responsible for causing the disclosure.

suit before there has been public disclosure. For example, a Stinson lawyer could file suit if he found the information on the street, or was given it surreptitiously by a Provident employee. Furthermore, under the majority's interpretation of "public disclosure," Stinson could have maintained this suit if the material had been produced under a protective order. Given that a person without "direct" knowledge may generally file suit, it is inconsistent to bar the same suit merely because that person publicly disclosed the information himself, or gave the information to an entity that later disclosed it. Under the majority's interpretation, because public disclosure has occurred, Stinson's "indirect" status now bars this suit. Similarly, a relator who obtains "second-hand" non-public information will be barred if he later voluntarily discloses the information in a Congressional hearing, or gives it to the news media. A relator's "indirect" status, not relevant before public disclosure, becomes the critical factor once disclosure occurs.

I do not think Congress intended this result. I believe that this interpretation might discourage people from making information public—essentially repeating the problem caused by the 1943 legislation. If an otherwise eligible relator can be barred simply because he makes information public, he would be encouraged not to do so. By contrast, reading the words "direct and independent" as referring to the public disclosure protects all those who are responsible for disclosures, the primary reason for including an original source exception. If Congress had intended to bar all "second-hand" relators, it could have done so explicitly, without predicating the bar on public disclosure. I agree that Congress focused on the paradigm of the whistleblowing insider, but the language of § 3730(e)(4) establishes that it did not intend to confine qui tam suits to those people. There is no apparent reason why Congress would bar "indirect" relators only after public disclosure has occurred.

Focusing on whether information was obtained from an "intermediary" is also overly restrictive. For example, under the ma-jority's holding, the Provident employee who conducted the telephone survey would qualify as an original source, but a co-worker who learned the information from that employee would not. Similarly, someone who is tipped off by an "insider" would not qualify, even if the insider declines to come forward. Referring to the *Dean* case, the majority posits that a state government that uncovered information through an independent investigation would not be barred. Majority Op. at 1161. However, if that state received the Provident memoranda from the same "intermediaries" as did Stinson, it would also be barred under the majority's interpretation. Much valuable information is obtained through "intermediaries" of some kind. All hearsay evidence fits this definition, regardless of its reliability. For example, many business records must be obtained from intermediaries, because the receiver does not have first-hand knowledge of the underlying facts. I believe Congress intended to encourage people to bring non-public information to light, regardless of how it is obtained. Eliminating information that has come through intermediaries would bar a large number of potential relators.

The legislative history does not conclusively establish the meaning of the words "direct and independent knowledge," but I believe it tends to contradict the majority's view. The original source language is clearly evocative of the failed 1943 Senate bill. This bill would have permitted suits based on "sources original" to the relator, and was described as allowing suits where the information was known to the government, but had been obtained from the relator. *See* 89 Cong.Rec. 10845 (1943). In 1986, Congress saw the lack of an original source exception as a major flaw in the 1943 amendments. When the original source exception was added late in the legislative process, I believe it was designed primarily to protect people who publicly disclosed information themselves, just as the 1943 bill would have protected people who provided information to the government. I do not believe it was inserted to

bar recovery by "second-hand" sources only when public disclosure has occurred.

There are other specific references that support linking the original source exception to the occurrence of public disclosure. First, the legislative history considered by the House states that "[a] person is an original source if he had some of the information ... in advance of the false claims being publicly disclosed." 132 Cong.Rec. 29322 (1986). Nowhere is a second "directness" bar mentioned. Second, § 3730(d)(1) provides the lowest level of recovery for those actions "based primarily on disclosures of specific information (*other than information provided by the person bringing the action*) relating to allegations or transactions in a ... civil ... hearing." (emphasis added). Before the emphasized language was inserted, Senator Grassley stated that "[t]his limitation will affect those persons who have brought a qui tam action based almost entirely on information of which they did not have independent knowledge but had derived from a public source." 132 Cong.Rec. 20536. This statement indicates that the "independent knowledge" in the original source exception refers to whether the knowledge was obtained independently of the public disclosure.

The emphasized language was inserted in the final amendment to make specific that people who are "original sources" with respect to only a small amount of information may nevertheless recover something. As Senator Grassley stated, "a 10–percent cap is placed on those 'original sources' who bring cases based on information already publicly disclosed where only an insignificant amount of that information stemmed from that original source." 132 Cong.Rec. 28580 (1986). This statement indicates that an original source is the person from whom the publicly disclosed information stemmed, regardless of how the original source obtained the information. I find no support for the view that the word "direct" was intended to constitute a separate jurisdictional bar. Rather, intending to redress a flaw similar to that in the 1943 legislation, Congress wanted to protect those relators who publicly disclose information.[4]

In my view, the more difficult question is whether a relator must somehow be connected with the public disclosure to qualify as an original source. This situation encompasses relators who learn of information that is later publicly disclosed through sources unconnected to the relator before the relator files suit. Congress may have felt that once information has been publicly disclosed, it is unnecessary to reward all those who knew of the information beforehand. Under this interpretation, the original source exception would protect only those people who disclosed the information themselves, or who provided the information to an entity that later disclosed it. The exception would therefore address the problem engendered by the 1943 legislation, which barred those who had provided information to the government. *See* § 3730(d) (lowest level of recovery for actions based primarily on publicly disclosed information, "other than information *provided by the person bringing the action*") (emphasis added). *But see 1990 Implementation Hearing* at 6 (a party with knowledge of fraud ought to be able to maintain an action if he had some of the information in advance of the public disclosure) (Statement of Sen. Grassley); 132 Cong.Rec. 20536 (1986) ("[A] qui tam action based solely on public disclosures cannot be brought by an individual with no direct or independent knowledge of the information *or* who had not been an original source to the entity that disclosed the allegations.") (Statement of Sen. Grassley) (repeated in *id.*) (emphasis added).

The Court of Appeals for the Second Circuit has held that "a plaintiff ... must have directly or indirectly been a source to the entity that publicly disclosed the allegations on which a suit is based." *United*

---

**4.** The majority emphasizes the district court decision in *United States v. Rockwell Int'l Corp.,* 730 F.Supp 1031, 1035–36 (D.Colo.1990), where the court held that one of two relators was not an original source because it did not possess first-hand knowledge of factual transactions. I disagree with this decision.

*States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16 (2d Cir.1990). In *Dick*, the relators based their suit almost entirely on information that had been publicly disclosed in the news media and elsewhere, but apparently possessed some information prior to the public disclosure. The court utilized statutory construction and legislative history to reach its conclusion, but also noted:

> Our interpretation ... is most likely to bring "wrongdoing to light" since, by barring those who come forward only *after* public disclosure ... it discourages persons with relevant information from remaining silent and encourages them to report such information at the earliest possible time.

*Id.* at 18 (quoting Senate Report at 14, 1986 U.S.Code Cong. & Admin.News 5279).

The court did not explain precisely to whom the individual is supposed to "report" the information. If the information must be reported to the government, and an unrelated entity later publicly discloses the same information, the relator would still be barred because he would not have been a source to the disclosing entity. Such a requirement might encourage people to report frauds to the news media rather than the government, or file premature suits—potentially inefficient results. It also raises the specter of "pre-emptive" public disclosures by potential defendants fearing imminent qui tam suits. The situation faced in *Dick* points out one problem with the 1986 amendments' focus on publicly disclosed information, in contrast to the 1943 amendments' focus on information possessed by the government.

However, I would not reach this issue. The only relevant public disclosure in this case occurred when Stinson filed the Provident memoranda with the Florida court. Because Stinson was itself the entity that disclosed the information, it should qualify as an original source. Had the documents been filed instead by Provident after they had been disclosed to Stinson, I might have faced the question of what connection, if any, is required between the disclosing entity and the relator.

The majority also holds that Stinson cannot qualify as an original source on the grounds that the Provident memoranda were not the sole source of information underlying this action. The first memorandum simply contained the statement "Left message—Same as us" beside Prudential's name and the name of a Prudential vice-president. As Stinson notes, this annotation is meaningless without prior knowledge of the claims procedures followed by Provident. The record indicates that Stinson was aware of possible improper practices by Provident prior to the *Leonard* litigation. *See United States ex rel. Stinson, Lyons et. al. v. Provident Life & Accident Ins. Co.*, 721 F.Supp. 1247, 1257–58 (S.D.Fla.1989) (discussing sources of information relating to Provident). Thus, Stinson argues that it is an original source of critical information regardless of whether it would qualify as an original source of the Provident memoranda.

One difficulty with this argument is that it is not clear from the record whether the other information about Provident's practices was also publicly disclosed in the *Leonard* litigation. If such disclosure occurred I would reach the question of whether it occurred in a "civil hearing," and potentially the issue of the requisite connection between the relator and the disclosing entity. The district court in *Provident* held that Stinson was an original source of the information regarding Provident because "even if there was no 'public disclosure' through the *Leonard* litigation, Stinson would still have learned of the information ... through its relationship with Leonard." *Id.* at 1258. Thus, the court assumed that no particular connection was required between Stinson and the public disclosure, as long as Stinson had the information before it was disclosed. Because I would hold that Stinson is an original source with respect to the Provident memoranda, I would not address these issues here.

The majority's holding requires a court to make subtle distinctions between "substantive" and "background" information. Regardless, I agree that a qui tam suit is

not barred merely because it is based on *some* information that was publicly disclosed within the meaning of § 3730(e)(4)(A), and the relator does not have direct and independent knowledge of that information. Section 3730(d) provides the lowest level of recovery for relators whose actions are based *primarily* on public disclosures. The legislative history of this subsection is clear that "a 10–percent cap is placed on those 'original sources' who bring cases based on information already publicly disclosed where only an insignificant amount of that information stemmed from that original source." 132 Cong Rec. 28580 (1986) (statement of Sen. Grassley). Thus, a relator who contributes some original information can maintain a suit despite the fact that most information underlying the suit was publicly disclosed and the relator does not have direct and independent knowledge of that information. But when the amount of original information is small, the recovery is reduced.[5]

### III. CONCLUSION

Section 3730(e)(4) applies only when information has been publicly disclosed through an enumerated method prior to the filing of a qui tam suit based on that information. Once such public disclosure has occurred, only an "original source" may maintain an action. Public disclosure does not occur until information is actually disclosed to the public. At a minimum, the person who has publicly disclosed the information should qualify as an original source. Because the Provident memoranda were publicly disclosed only when Stinson filed them with the Florida court, and Stinson qualifies as an original source with respect

to this disclosure, I would find that this suit is not barred by § 3730(e)(4).

---

5. I also note that the statute does not distinguish among different people who may qualify as original sources. It is possible that more than one person can be an original source with respect to certain publicly disclosed information, just as more than one person might be eligible to file an action based on undisclosed information. *See* § 3730(e)(4)(A) (action can be brought if person is *"an* original source") (emphasis added). In this case, for example, Mr. Leonard might also qualify as an original source, as might the Provident employee who

first produced the memoranda. Barring an otherwise eligible relator merely because there is someone else with a more direct connection to the information would invite challenges by defendants listing other eligible sources who may never come forward. However, once an eligible relator has brought an action, no other private party can bring an action based on the same information. *See* § 3730(b)(5). This situation creates a potential "race to the courthouse" among eligible relators, but such a race may also spur the prompt reporting of fraud.