84 F.3d 358
 96 Cal. Daily Op. Serv. 3686, 96 Daily Journal
D.A.R. 6016
UNITED STATES of America, ex rel. William DEVLIN; Stanley
H. Sidicane; Rod Kodman, Plaintiffs-Appellants,
v.
STATE OF CALIFORNIA; County of Mariposa; and Tom Archer,
Defendants-Appellees.
 No. 93-16729.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 15, 1995.
Decided May 24, 1996.
 
 William Devlin, Fresno, California; Stanley H. Sidicane, Opelika, Alabama; Rod Kodman, Merced, California, in pro per for plaintiffs-appellants.
 Steven Wayne Dahlem, Mariposa, California; Theodore Garelis, Deputy Attorney General, Sacramento, California, for defendants-appellees.
 Appeal from the United States District Court for the Eastern District of California, Robert E. Coyle, District Judge, Presiding.
 Before NORRIS, WIGGINS, and FERNANDEZ, Circuit Judges.
 OPINION
 WILLIAM A. NORRIS, Circuit Judge:
 
 
 1
 This is a qui tam action filed under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733 (1988), based upon allegations that the Social Services Department of Mariposa County ("SSD") has defrauded the United States government by inflating client statistics in order to qualify for increased federal funding under various federal programs. The district court dismissed the action for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) on the ground that the relators were not an "original source" of the information on which the allegations of fraud were based as required by § 3730(e)(4) of the FCA.[1] We affirm.
 
 
 2
 * The facts relevant to the original source issue are not in dispute: During the week of January 13, 1992, relators Rod Kodman and William Devlin were informed of the alleged fraud by William Cotey, an SSD employee who had participated in the fraud by falsifying records. Shortly thereafter, relator Devlin, Cotey, and Cotey's wife met with Jerry Rankin, a Mariposa Gazette reporter, and told him about the alleged fraud. On February 6, 1992, the Mariposa Gazette published an article by Rankin describing SSD's allegedly fraudulent conduct. Five days after Rankin's article appeared, the relators filed this qui tam action.
 
 
 3
 Because the action was filed after the Mariposa Gazette publicly disclosed the allegations of fraud, the district court lacked subject matter jurisdiction unless the relators were an "original source" of the information upon which the allegations were based.[2] 31 U.S.C. § 3730(e)(4)(A); United States ex rel. Fine v. Chevron, 72 F.3d 740, 743 (9th Cir.1995) (en banc). The district court held that the relators were not an original source because their knowledge of the fraud allegedly perpetrated by SSD was not "direct and independent" within the meaning of § 3730(e)(4).[3]
 
 II
 
 4
 Only two Ninth Circuit cases address the question of what constitutes "direct and independent" knowledge for purposes of § 3730(e)(4). In both cases, we held that the relator had "direct and independent" knowledge because he had discovered the information underlying his allegations of wrongdoing through his own labor.[4] In Wang v. FMC Corp., 975 F.2d 1412 (9th Cir.1992), we held that an engineer-relator who had been called in to study a problem with a product had "direct and independent" knowledge of the problem because "he saw [it] with his own eyes" and his knowledge was "unmediated by anything but [his] own labor." Id. at 1417. Similarly, we held in United States ex rel. Barajas v. Northrop Corp., 5 F.3d 407 (9th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1543, 128 L.Ed.2d 195 (1994), that an employee of a government subcontractor who brought a qui tam action alleging falsified testing had "direct and independent knowledge" of the allegations because "he acquired [his knowledge] during the course of his employment [by the subcontractor]." Id. at 411.
 
 
 5
 In this case, the relators' knowledge was not direct and independent because they did not discover firsthand the information underlying their allegations of fraud.[5] They did not see the fraud with their own eyes or obtain their knowledge of it through their own labor unmediated by anything else, but derived it secondhand from Cotey, who had firsthand knowledge of the alleged fraud as a result of his employment at SSD.
 
 
 6
 The relators argue that their knowledge of the alleged fraud was direct because of relator Devlin's personal efforts to verify the accuracy of the information the relators obtained from Cotey. It is true that Devlin contacted persons who told him that they did not receive services for which SSD allegedly billed the government. The question, however, is whether the verification Devlin obtained from these persons added anything of significance to the information the relators obtained from Cotey. We do not believe it did. The information Cotey disclosed to the relators is that SSD had fraudulently billed the government for services to persons who had not received the services, together with a description of those services and a list of the names of the persons SSD claimed to have received the services. Armed with all that information, anyone could easily have done what Devlin did: contact persons on Cotey's list and ask them whether they had in fact received the services that had been described by Cotey. That is all Devlin did, and it is a virtual certainty that federal investigators would have done precisely the same thing once the information provided by Cotey had been made public. Viewed in this light, the knowledge Devlin obtained did not make a genuinely valuable contribution to the exposure of the alleged fraud.
 
 
 7
 The facts of this case thus differ materially from the facts in United States ex rel. Springfield Terminal Ry. v. Quinn, 14 F.3d 645 (D.C.Cir.1994), where the relator's own personal knowledge was essential to his conclusion that a fraud had been committed. Id. at 656-57 (employer-relator had direct and independent knowledge that a labor arbitrator had fraudulently billed the government for services not actually rendered because the relator's personal knowledge of the arbitration process and his interviews with the persons with whom the arbitrator had allegedly worked were essential to the conclusion that a fraud had been committed).
 
 
 8
 Our holding is in keeping with the purpose of the FCA, which aims at ferreting out fraud by encouraging persons with firsthand knowledge of alleged wrongdoing to come forward. It is "the cooperation of individuals who are either close observers or otherwise involved in the fraudulent activity" that Congress sought to enlist through the qui tam provisions of the FCA. S.Rep. No. 345, 99th Cong., 2d Sess. 4, reprinted in 1986 U.S.C.C.A.N., 5269 (emphasis added); see also United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1154 (3d Cir.1991) (FCA seeks to "encourage persons with first-hand knowledge of fraudulent misconduct" to come forward) (emphasis added). Conversely, the original source requirements of § 3730(e)(4) are intended to bar parasitic suits through which a plaintiff seeks a reward even though he has contributed nothing significant to the exposure of the fraud. As our court and others have explained, the 1986 amendments to the FCA steer a course between an overly restrictive interpretation of the FCA on the one hand, as exemplified by United States ex rel. Wisconsin v. Dean, 729 F.2d 1100 (7th Cir.1984) (barring jurisdiction whenever the Government possessed the information on which the claim was brought, even if it was the relator who had provided the government with the information), and an unrestrained permissiveness on the other, as exemplified by United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943) (allowing qui tam actions based solely on information already publicly disclosed). In other words, the FCA has been shaped by Congress's "[s]eeking the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own."[6] Springfield Terminal Ry., 14 F.3d at 649; see also Wang, 975 F.2d at 1418-19, Stinson, 944 F.2d at 1154.
 
 
 9
 In holding as we do, we join the three other circuits that have considered this question, all of which have also decided that a person who learns secondhand of allegations of fraud does not have "direct" knowledge within the meaning of 31 U.S.C. § 3730(e)(4)(B). See United States ex rel. Barth v. Ridgedale Elec., Inc., 44 F.3d 699, 703 (8th Cir.1995) ("a person who obtains secondhand information from an individual who has direct knowledge of the alleged fraud does not himself possess direct knowledge and therefore is not an original source under the [FCA]"); United States ex rel. Kreindler & Kreindler v. United Technologies Corp., 985 F.2d 1148, 1159 (2d Cir.) (attorney-relator who obtains information of alleged wrongdoing through disclosures made by alleged wrongdoer in discovery in a previous lawsuit does not have significant direct and independent knowledge; neither the collateral research and investigations conducted by the attorney nor his background knowledge that enabled him to understand the significance of the disclosures were enough to establish that he had direct and independent knowledge), cert. denied, 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993); Stinson, 944 F.2d at 1161 ("nothing ... would bar suit by someone who learned of the fraud from an insider, if the information had not yet been publicly disclosed") (emphasis added). But see id. at 1173 (Scirica, J., dissenting) ("If Congress had intended to bar all "second-hand" relators, it could have done so explicitly, without predicating the bar on public disclosure.").
 
 
 10
 The judgment of the district court dismissing the relators' complaint for lack of subject matter jurisdiction is AFFIRMED.
 
 
 
 [1]
 Section 3730(e)(4) of the FCA provides:
 (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions ... from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
 (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.
 31 U.S.C. § 3730(e)(4).
 
 
 [2]
 The exception to § 3730(e)(4)(A)'s bar against suits based on publicly disclosed allegations for suits brought by the Attorney General is plainly inapplicable
 
 
 [3]
 To be an "original source," a relator must show that he or she has "direct and independent knowledge of the information on which the allegations are based," 31 U.S.C. § 3730(e)(4)(B), "voluntarily provided the information to the Government before filing" his or her qui tam action, id., and "had a hand in the public disclosure of allegations that are a part of [his or her] suit," Wang v. FMC Corp., 975 F.2d 1412, 1418 (9th Cir.1992). It is undisputed that the relators have satisfied the latter two requirements
 
 
 [4]
 A panel of this court reached a similar result in United States ex rel. Fine v. Chevron, 39 F.3d 957 (9th Cir.1994), holding that an auditor-relator had "direct and independent" knowledge of the information underlying his qui tam action because his "own labor"--reviewing audit sheets and other financial records--led to his discovery of the allegedly fraudulent payments. Id. at 961-62. The panel opinion was vacated by the en banc court that reheard the case. Fine, 72 F.3d at 741 n. 1. The en banc court did not reach the question of whether Fine's knowledge was direct and independent because it held that Fine failed the "voluntary" prong of the original source test. Id. at 743
 Other circuits have likewise held that knowledge is "direct" when it derives from information obtained firsthand through the relator's own labor. Cooper ex rel. United States v. Blue Cross & Blue Shield of Florida, Inc., 19 F.3d 562, 568 (11th Cir.1994) (per curiam) (relator's knowledge of an alleged fraud by a Medicare secondary payer is direct because it was acquired through "three years of [the relator's] own claims processing, research, and correspondence with members of Congress and [the Health Care Financing Administration]"); Houck ex rel. United States v. Folding Carton Admin., 881 F.2d 494, 505 (7th Cir.1989) (attorney-relator had direct knowledge of alleged fraudulent distribution of settlement because his knowledge resulted from his involvement in assisting late class action claimants in recovering money out of settlement order funds), cert. denied, 494 U.S. 1026, 110 S.Ct. 1471, 108 L.Ed.2d 609 (1990); see also United States ex rel. Springfield Terminal Ry. v. Quinn, 14 F.3d 645, 656 (D.C.Cir.1994) (defining "direct" for purposes of § 3730(e)(4) as "marked by absence of an intervening agency"); United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1160 (3d. Cir.1991) (defining "direct" for purposes of § 3730(e)(4) as "marked by absence of an intervening agency, instrumentality, or influence" and holding that attorney-relator did not have direct knowledge because his information of the alleged wrongdoing, obtained through a memorandum produced in discovery in a prior lawsuit, came through two intermediaries: the company employee who was responsible for the memorandum and the discovery process).
 
 
 [5]
 The relators argue that they had direct and independent knowledge of the information upon which the allegations were based because they had evidence of the fraud prior to the public disclosure of the allegations. Relator Devlin interviewed Cotey about the fraud during the week of January 13, 1992, that is, at least two weeks before the Mariposa Gazette article describing the fraud appeared. Relator Kodman also received on January 21, 1992, 15 days before the article appeared, a letter from Cotey outlining the fraud and providing him with ledger cards and sheets documenting the allegedly fraudulent work. The fact that the relators had evidence of the fraud prior to the public disclosure of the allegations establishes that their knowledge was "independent." See Wang, 975 F.2d at 1417. Implicit in the relators' argument, therefore, is the contention that a showing that knowledge is "independent" is sufficient to satisfy § 3730(e)(4)'s requirement that an "original source" have "direct and independent" knowledge. The statute, however, is clear that an "original source" must have knowledge that is both direct and independent. See 31 U.S.C. § 3730(e)(4)(B) ("original source" means an individual who has direct and independent knowledge) (emphasis added); United States ex rel. Barth v. Ridgedale Elec., Inc., 44 F.3d 699, 703 (8th Cir.1995) (§ 3730(e)(4)(B) imposes a conjunctive requirement of both independent and direct knowledge); Springfield Terminal Ry., 14 F.3d at 656 (same); Stinson, 944 F.2d at 1160 (same). But see Stinson, 944 F.2d at 1172-74 (Scirica, J., dissenting) (arguing that Congress did not intend the word "direct" to constitute a separate jurisdictional bar)
 
 
 [6]
 We do not intend to suggest that the relators in this case were opportunistic. We recognize that they had a hand in the public disclosure of the alleged fraud through their participation in the meeting with the Mariposa Gazette reporter. Congress, however, has placed an obstacle in their path to the courthouse door: the "original source" requirements established by § 3730(e)(4)