Robert **WERCINSKI**, et al.,

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION.**

Civil Action No. H–95–3387.

United States District Court, S.D. Texas, Houston Division.

Oct. 9, 1997.

---

D. John Leger, Leger Coplen & Jefferson, Houston, TX, for Plaintiffs.

Lee Hamel, Lee Hamel and Associates, Houston, TX, Linda S. Bruggeman, Crowell and Moring, Washington, DC, for Defendant.

### AMENDED ORDER

GILMORE, District Judge.

Pending before the Court is Defendant's Motion to Dismiss for Lack of Jurisdiction

(Instrument # 39). Having reviewed the submissions of the parties and the applicable law, this Court has determined that Defendant's motion should be **GRANTED.**

## I. Background

This action was brought on behalf of the United States by Relators Robert Wercinski ("Wercinski") and Emil Kuropata ("Kuropata") pursuant to 31 U.S.C. §§ 3729–3733. ("False Claims Act"). Both Wercinski and Kuropata are employed by the Defense Contract Audit Agency ("DCAA") as auditors. In 1990, the DCAA received information that Defendant International Business Machines ("IBM") had overcharged the United States for work it performed for National Aeronautics and Space Administration ("NASA") and the Department of Defense ("DOD"). Allegedly, IBM leased office space in a building owned by Middlebrook Associates, a joint venture in which IBM was a 50% partner with Cadillac Fairview Urban Development, Inc., a Delaware corporation. By improperly classifying this lease as an "operating lease" instead of a "capital lease", IBM circumvented restrictions limiting chargeable costs to normal ownership expenses and included in overhead ultimately billed to NASA and DOD all of its lease expenses. In other words, IBM increased its overall profits by recovering costs of leasing space in a building it already owned.

Upon receipt of such information, DCAA immediately conducted an audit of relevant IBM records, in which Wercinski and Kuropata participated. Three audit reports prepared, at least in part, by Relators revealed that IBM had, according to DCAA, in fact "misclassified the building lease as an operating lease when it should be a capital lease," resulting in "lease cost. ... exceed[ing] constructive cost of ownership by $13,935,446 for calendar years 1986 through 1989."[1] (De-

---

1. Guidance for the treatment of lease costs is covered by Financial Accounting Standards Board Statement No. 13, Accounting for Leases, which provides that a lease shall be a capital lease if one or more of the following factors is present:
(1) Lease transfers ownership (title) to lessee during lease term;
(2) Lease contains a bargain purchase option;
(3) Lease term is 75 percent or more of economic useful life of property; and
(4) Present value of minimum lease payments equals 90 percent or more of fair market value ("FMV") of the leased property less lessor investment tax credit.

fendant's Memorandum of Law in Support of its Motion to Dismiss for Lack of Jurisdiction, Instrument No. 39, Ex.5 at 3). The reports further concluded that IBM had failed to limit "the amount of lease or rental payments between organizations under common control [such as Middlebrook Associates and IBM] 'to the normal costs of ownership, such as depreciation, taxes, insurance, facilities capital cost of money and maintenance' " and had "continue[d] to include ... unallowable costs in its billings to the Government. "[2] (Defendant's Memorandum of Law in Support of its Motion to Dismiss for Lack of Jurisdiction, Instrument No. 39, Ex.6 at 3, Ex.7 at 4). IBM received draft copies of DCAA's three reports on August 14, 1991, August 12, 1992, and November 4, 1992, respectively. Kuropata, a supervisory auditor, was listed as the contact person on each report.

IBM objected to the allegations asserted against it in DCAA's reports, maintaining that its lease was "properly classified and accounted for by IBM as an operating lease as required by [Financial Accounting Standards] and therefore all 'the lease costs were allowable.' " (Defendant's Memorandum of Law in Support of its Motion to Dismiss for Lack of Jurisdiction, Instrument No. 39, Ex.8). IBM also disputed DCAA's calculations regarding the amount it allegedly overcharged the government due to the misclassified lease. According to IBM, "a mathematical difference of $547K results when comparing operating lease accounting and capital lease accounting for the Bay Area Building [in which it leased space] for the period August 1986 to May 1993." (Defendant's Memorandum of Law in Support

of its Motion to Dismiss for Lack of Jurisdiction, Instrument No. 39, Ex.8).

Relators contend that during the course of their audit of IBM, they became "concerned that the over–billing of the lease costs by IBM in violation of federal law was not the result of accident, mistake, or professional disagreement, but rather was the result of a conscious and company wide effort by [IBM] to increase its profits on government contracts at the expense of tax–payers." (Defendant's Memorandum of Law in Support of its Motion to Dismiss for Lack of Jurisdiction, Instrument No. 39 at 2–3). Once alerted to the possibility that IBM may have defrauded the Government, Relators claim that they immediately, in compliance with DCAA regulations, reported their suspicions to their supervisors. After the DCAA refused to take any action against IBM, Relators referred the matter to the Office of the Inspector General–National Aeronautics and Space Administration ("NASA–IG") for investigation. Subsequently, NASA–IG transferred the case to the Department of Justice in Washington, D.C. ("Main Justice") because it did not have the authority to handle matters, such as this, where the purported amount in controversy exceeded $5,000,000. When, however, Main Justice failed to respond to their complaint, Relators filed, on their own, this qui tam suit against IBM on June 26, 1995.

In accordance with 31 U.S.C. § 3730, this action was filed in camera, remaining under seal while the United States determined whether or not its intervention was necessary. In addition, the government was provided with a copy of the complaint and written disclosure of substantially all material evidence and information relied upon by Re-

(Defendant's Memorandum of Law in Support of its Motion to Dismiss for Lack of Jurisdiction, Instrument No. 39, Ex. 5 at 2–3). Relators contend that the fourth factor existed in the lease agreement at issue in the instant case.

2. While "common control" is not specifically defined under the Federal Acquisition Regulations ("FAR") which govern transactions of this nature, the Relators nonetheless assert that the Middlebrook Associates Joint Venture was under IBM's control because, IBM, as a 50% owner, "has the majority vote ... for all major decisions presented to the Joint Venture." (Defendant's

Memorandum of Law in Support of its Motion to Dismiss for Lack of Jurisdiction, Instrument No. 39, Ex. 6 at 4). Relators cite, in their audit report, to an analogous provision under FAR stating that "[a] party is considered to control of have the power to control a concern, if the party controls or has the power to control 50 percent or more of the concern's voting stock." *Id.* Relators also determined that "the terms of the partnership provide[d] IBM with control over all major decisions of the Partnership and clearly indicate common control of IBM and the Joint Venture." *Id.*

lators to substantiate their claim. On May 24, 1996, the United States filed a notice declining to intervene and proceed with this action. (Instrument No. 21). The seal in this matter was lifted in part on May 30, 1996, allowing Relators to send IBM a copy of the complaint for settlement purposes but preventing disclosure of all other pleadings until further order of the Court. (Instrument No. 23). On June 14, 1996, the Court ordered the remainder of the file to be unsealed. (Instrument No. 25). Relators were then ordered to serve a summons on IBM by August 31, 1996. (Instrument No. 25).

On September 13, 1996, Relators filed an Amended Complaint (Instrument No. 35), contending that IBM violated section 3729 of the False Claims Act ("FCA") by knowingly presenting or causing to be presented to the United States government a false or fraudulent claim for payment or approval, by knowingly making or using a false record or statement in order to obtain approval or payment of a false or fraudulent claim and by knowingly using or making a false record or statement to decrease an obligation to pay money to the government. (First Amended Complaint, Instrument No. 35 at 5). Relators assert two causes of action, basing their first cause of action on IBM's alleged noncompliance with FAR 31.205–36(b)(3) which restricts the amount of lease or rental payments between organizations under common control to only normal costs of ownership and their second cause of action on IBM's mischaracterization of its lease as a operating lease when it was in fact a capital lease.

On October 7, 1996, IBM filed this motion to dismiss for lack of jurisdiction under Federal Rule of Procedure 12(b)(1) (Instrument No. 38), arguing that this Court lacks subject matter jurisdiction under 31 U.S.C. § 3730(e)(4)(A) because, in direct contravention of FCA's proscriptions, this suit is based upon publicly disclosed information, namely the DCAA audit reports. IBM contends that the results of the audits were divulged at a congressional hearing held by the Subcommittee on Oversight and Investigations of the House of Representatives Committee on Energy and Commerce on July 27, 1994, reprinted in an article appearing in the Los Angeles Times the day following the hearing, on July 28, 1994, and given to McDonnell Douglas on March 2, 1995, in connection with another unrelated matter. IBM also contends Relators' allegations against it were disclosed by NASA–IG to such third parties as Prentiss Properties, Price Waterhouse, and Loral Corporation during the course of NASA–IG's investigation into IBM's purportedly unlawful conduct. In addition, IBM maintains that besides its basis in materials previously disseminated to the public, Relators do not qualify as "original sources" of the information such as to allow this action to continue.

In response, Relators argue that the allegations made in their complaint were not "based upon" publicly disclosed information; rather Relators relied on information they had acquired during their audit of IBM's allegedly fraudulent billing practices prior to 1994. Relators also argue that any remark regarding the IBM investigation made at the congressional hearing on July 27, 1994, or any statement referencing the same included in the Los Angeles Times article on July 28, 1994, does not constitute a "public disclosure of the allegations or transactions" underlying their complaint sufficient to trigger the jurisdictional bar to suit under § 3730(e)(4)(A). In the alternative, Relators argue that they are indeed "original sources" of the information upon which their complaint is based pursuant to § 3730(e)(4)(B).

## II. Standard of Review

Due to their limited jurisdiction, federal courts may adjudicate a case or controversy only if there is both constitutional and statutory authority for federal jurisdiction. *Marathon Oil Co., v. Ruhrgas, A,G.,* 115 F.3d 315, 317 (5th Cir.1997). Moreover, "statutes conferring jurisdiction on federal courts are to be strictly construed, and doubts resolved against federal jurisdiction." *F&S Constr. Co. v. Jensen,* 337 F.2d 160, 161 (10th Cir.1964). Thus, a court's jurisdiction is "presumed not to exist absent a showing by the party invoking federal jurisdiction." *U.S. ex rel. Fine v. MK–Ferguson Co.,* 99 F.3d 1538, 1543 (10th Cir. 1996); *see also Penteco Corp. Ltd. Partnership 1985A v. Un-*

*ion Gas System, Inc.,* 929 F.2d 1519, 1521 (10th Cir.1991) (holding that "there is a strong presumption against federal jurisdiction" and the party seeking to invoke such jurisdiction bears the burden of showing its existence). ·

Section 3730(e)(4) of the FCA specifically addresses the court's subject matter jurisdiction and provides, in pertinent part, that:

> [n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.... For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A)–(e)(4)(B) (Supp. 1997). · ·

 When, however, subject matter jurisdiction depends upon the same statute that creates the substantive claim, such as in the instant case, the jurisdictional inquiry is considered to be intertwined with the merits. *Wheeler v. Hurdman,* 825 F.2d 257, 259 (10th Cir.1987); *Clark v. Tarrant County,* 798 F.2d 736, 742 (5th Cir.1986); *see also U.S. ex rel. Ramseyer v. Century Healthcare Corp.,* 90 F.3d 1514, 1518 (10th Cir.1996) ("In a *qui tam* suit brought under the FCA, the jurisdictional issue of 'public disclosure' clearly arises out of the same statute that creates the cause of action."). In other words, "[w]here the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." *Williamson v. Tucker,* 645 F.2d 404, 415 (5th Cir.1981). Thus, in these situations, Rule 12(b)(1) motions to dismiss for lack of jurisdiction should instead be resolved under Rule 12(b)(6) or, after proper conversion into a motion for summary judgment, under Rule 56. *Fine,* 99 F.3d at 1543. ·

In attacking Relators' factual basis for asserting jurisdiction and not simply the facial validity of their complaint, IBM has submitted evidence outside the pleadings for the Court's consideration. Relators, in responding to IBM's motion, have also submitted their own evidentiary materials for review. Because the Court has accepted and evaluated the submissions of both parties, it will therefore exercise its discretion to convert IBM's motion into a motion for summary judgment under Rule 56(c). *See* FED. R.CIV.P. 12(b) ("If ... matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment....").

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56. A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. at 2510. If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511; *see Lewis v. Glendel Drilling Co.,* 898 F.2d 1083, 1088 (5th Cir.1990). The summary judgment procedure, therefore, "enables a party 'who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that [specific] fact before the lengthy process of litigation continues.'" *Microsoft Corp. v. CMOS Tech. Inc.,* 872 F.Supp. 1329, 1334 (D.N.J.1994) (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990)).

Under Rule 56(c), the moving party bears the initial burden of informing the district

court of the basis for its belief that there is an absence of a genuine issue for trial, and for identifying those portions of the record that demonstrate such absence. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Leonard v. Dixie Well Serv. & Supply, Inc.,* 828 F.2d 291, 294 (5th Cir.1987).

Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (quoting FED.R.CIV.P. 56(e)) (emphasis in original); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Leonard,* 828 F.2d at 294. To sustain the burden, the nonmoving party must produce evidence admissible at trial. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2514; *Thomas v. Price,* 975 F.2d 231, 235 (5th Cir.1992) ("To avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue...."). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonable find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

## III. False Claims Act

The FCA, which prohibits the submission of false or fraudulent claims to the government for payment, was enacted in 1863 in an effort to deter profiteering by Union Army suppliers. *U.S. ex. rel. Williams v. NEC Corp.,* 931 F.2d 1493, 1496–97 (11th Cir.1991). The FCA, also known as the "federal whistleblower statute", specifically authorized suits, referred to as qui tam actions, brought by private citizens or "relators" on behalf of the Government to "aid in the effort to root out fraud against the government." *Erickson ex rel. United States v. American Inst. of Biological Sciences,* 716 F.Supp. 908, 915 (E.D.Va.1989); *see also Cooper v. Blue Cross and Blue Shield of Florida, Inc.,* 19 F.3d 562, 565 n. 2 (11th Cir.1994) (stating that the FCA

specifically provided for qui tam actions to "encourage private citizens or 'relators' to come forward and expose fraud against the government"). If successful, the relator was entitled to retain a certain percentage of the ultimate recovery. Congress believed that such an incentive would encourage more individuals who had uncovered fraud during the course of their employment to come forward and provide that information to the government, which, generally, was not only unaware of its contractors' unlawful activities but also otherwise unable to acquire knowledge or evidence of their wrongdoing. Patrick W. Hanifin, *Qui tam Suits by Federal Government Employees Based on Government Information,* 20 PUB.CONT.L.J. 556, 563 (1991) (stating that according to the Senate sponsor of the original False Claims Act, Congress intended these suits to apply " 'the old-fashioned idea of holding out a temptation, and setting a rogue to catch a rogue which is the safest and most expeditious way ... of bringing rogues to justice' ") (quoting Statement of Senator Howard, Cong. Globe 37th Cong., 3d Session 956 (1863)). Although the objective was to reward those who assisted the government in prosecuting contractor misconduct, qui tam actions were permitted under the language of the original act "even though that private individual contributed nothing to the exposure of the fraud alleged." *Williams,* 931 F.2d at 1497.

In 1943, the FCA was amended to reduce the number of such "parasitical suits" filed by opportunistic relators who used, as the basis of their FCA claim, information already known to the government. *LeBlanc v. Raytheon Co. Inc.,* 729 F.Supp. 170, 174 n. 6 (D.Mass.1990) (stating that the False Claims Act was amended in 1943 to "stem the tide of 'parasitical actions' in which relators would base their litigation on information already secured by the government in the regular course of law enforcement"). This revised version of the FCA included a broad jurisdictional bar against qui tam suits "whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought." 31 U.S.C. § 232(c) (Supp.1943). However, it was soon discover-

ed that the 1943 provisions had, in practice, proven to be too broad, prohibiting suits by "honest informants" who provided new information to the government in addition to parasitical actions. *LeBlanc*, 729 F.Supp. at 174; *see also* Joan R. Bullock, *The Pebble in the Shoe: Making the Case for the Government Employee*, 60 TENN.L.REV. 365, 371 (1993).

Due to the 1943 Act's restrictive language, the use of the qui tam actions as a method of exposing procurement fraud declined. Major David Wallace, *Government Employees as Qui Tam Relators*, 1996–AUG ARMY LAW. 14, 16 (1996). In response to this decline and to the increase in government procurement spending, which resulted in a corresponding rise in contractor fraud, the Act was amended again in 1986 to "expand the qui tam provisions to 'encourage more private enforcement suits.'" *United States v. CAC–Ramsay, Inc.*, 744 F.Supp. 1158, 1161 (S.D.Fla.1990) (quoting S.Rep. No 345, 99th Cong., 2d Sess. 23 (1986)). "The 1986 amendments were intended to increase private citizen involvement in exposing fraud against the government while preventing opportunistic suits by private persons who heard of fraud but played no part in exposing it." *Cooper*, 19 F.3d at 565. "The paradigm qui tam plaintiff is the 'whistleblowing insider.' Qui tam suits are meant to encourage insiders privy to a fraud on the government to blow the whistle on crime. In such a scheme, there is little point in rewarding a second toot." *Wang v. FMC Corp.*, 975 F.2d 1412, 1419 (9th Cir.1992).

To accomplish the goal of encouraging assistance from the private citizenry while simultaneously preventing unrestrained parasitism, language prohibiting suit based on information already in the possession of the government at the inception of the action was eliminated and replaced with language granting any person the right to bring a civil action subject only to certain jurisdictional limitations, limitations focused primarily on eliminating parasitic suits. *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 651 (D.C.Cir.1994) (finding that the 1986 amendments must "be analyzed in the context of these twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own."); Robert Vogel, *The Public Disclosure Bar Against Qui Tam Suits*, 24 PUB. CONT.L.J. 477, 506–07 (1995) (stating that the Senate and House Reports "demonstrate that Congress wanted to encourage relators to come forward with relevant evidence about fraud.... At the same time, Congress wanted to bar 'parasitic' relators who had no new evidence or information to contribute...."). IBM contends that one of these limitations—§ 3730(e)(4)(A), the prohibition referenced above against suits based on "public disclosures" brought by parties not "original sources" to the information—is at issue here.[3]

3. The Act provides in relevant part:

(e) Certain actions barred.—(1) No court shall have jurisdiction over an action brought by a former or present member of the armed forces under subsection (b) of this section against a member of the armed forces arising out of such person's service in the armed forces.

(2)(A) No court shall have jurisdiction over an action brought under subsection (b) against a Member of Congress, a member of the judiciary, or a senior executive branch official if the action is based on evidence or information known to the Government when the action was brought.

(B) For purposes of this paragraph, "senior executive branch official" means any officer of employee listed in paragraphs (1) through (8) of section 101(f) of the Ethics in Government Act of 1978 (5 U.S.C.App.).

(3) In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.

(4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e) (Supp.1997).

## IV. Public Disclosure Bar

The jurisdictional inquiry under section 3730(e)(4)(A) involves the following three questions: (1) whether there has been a "public disclosure" within the meaning of the statute; (2) whether the relator's complaint is "based upon" this "public disclosure"; and if so (3) whether the relator qualifies as an "original source" of the information. *Federal Recovery Services, Inc. v. U.S.*, 72 F.3d 447, 450 (5th Cir.1995); *U.S. ex. rel Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1347 (4th Cir.1994); *Williams*, 931 F.2d at 1500 n. 12; *see also Fine*, 99 F.3d at 1544 (holding that a four part inquiry determines if jurisdiction is proper "(1) whether the alleged 'public disclosure' contains allegations or transactions from one of the listed sources; (2) whether the alleged disclosure has been made 'public' within the meaning of the False Claims Act; (3) whether the relator's complaint is 'based upon' this 'public disclosure'; and if so, (4) whether the relator qualifies as an 'original source' under section 3730(e)(4)(B)").

IBM argues that the information forming the basis of Relators' complaint was disclosed to the public on numerous occasions prior to the commencement of this action, thereby barring such suit unless Relators are determined to be "original sources" of the information. IBM produces evidence of comments made by the Chairman of the Subcommittee on Oversight and Investigations, the Honorable John D. Dingell ("Dingell") during a congressional hearing on July 27, 1994. Dingell said that:

> another Space Station subcontractor— IBM—engaged in highly questionable billing practices. Of the $490 million of costs incurred by this contractor over several years, DCAA is questioning $107 million as unallowable. IBM, without authorization, spent $40 million for equipment, among other things, that they knew was being provided by another contractor. DCAA found this "unnecessary and duplicative" and therefore unallowable. IBM also charged $20 million to the Space Station for leasing a building that IBM already owned.

(Defendant's Memorandum of Law in Support of Its Motion to Dismiss for Lack of Jurisdiction, Instrument No. 39, Ex. 11 at 3). IBM also submits a Los Angeles Times article which attributes the following statement to Michael Thibault ("Thibault"), an assistant director of the DCAA: "[A]n audit of charges by IBM, a subcontractor to McDonnell Douglas, found that about 20% of IBM's $490 million in charges over a several-year period were not allowable under its contract. The charges included $20 million to the space station for leasing a building IBM already owned, an issue now under criminal investigation in Houston." (Defendant's Memorandum of Law in Support of Its Motion to Dismiss for Lack of Jurisdiction, Instrument No. 39, Ex. 12 ). In addition, IBM contends that the nature of the allegations asserted against it in this proceeding was disclosed to McDonnell Douglas on March 2, 1995, in different audit report prepared by DCAA which referenced the results of DCAA's earlier audits of IBM. This report stated that DCAA's "audit disclosed that IBM billed lease costs in excess of ownership costs to the government on a building which [DCAA] consider[s] to be a capital lease under [Financial Accounting Standards] criteria." (Defendant's Memorandum of Law in Support of Its Motion to Dismiss for Lack of Jurisdiction, Instrument No. 39, Ex. 13 at 10). The report further claimed that $11,-214,273 of the total lease costs IBM billed the Government were questionable. *Id.* Finally, IBM asserts that similar disclosures occurred during NASA–IG's investigation, specifically, when subpoenas and documents requests outlining the nature of the allegations against IBM were issued by NASA–IG to Prentiss Properties, Price Waterhouse and Loral Corporation.

### A. Material Elements of Fraud Disclosed

Relators do not dispute that these statements regarding IBM's allegedly fraudulent billing practices were disclosed to the public in a statutorily listed manner, method or forum. Rather, Relators argue that such disclosures do not reveal all the material elements of fraud or evidence sufficient to alert the government of possibly wrongdoing

as required to trigger the public disclosure bar under § 3730(e)(4)(A).

■ The public disclosure requirement of § 3730(e)(4)(A) was designed to "preclude qui tam suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator." *United States ex rel. Stinson v. Prudential Life Ins. Co.*, 944 F.2d 1149, 1155–56 (3d Cir. 1991); *Ramseyer*, 90 F.3d at 1520–21 (stating that "public disclosure occurs only when the allegations or fraudulent transactions are affirmatively provided to others not previously informed thereof"). However, public disclosure requires more than just public access to information. Rather, "the allegation of fraud or the critical elements of the fraudulent transaction themselves [must be] in the public domain." *Springfield*, 14 F.3d at 654. In addition, "the relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of the publicly disclosed transaction or allegation." *Stinson*, 944 F.2d at 1160. When such information surfaces publicly, "there is little need for qui tam actions, which would tend to be suits that the government presumably has chosen not to pursue or which might decrease the government's recovery in suits it has chosen to pursue." *Springfield*, 14 F.3d at 654.

In discussing the particular type of information that must be disclosed under § 3730(e)(4)(A), the court in *United States ex rel. Springfield Terminal Ry. v. Quinn*, provided the following illustration:

> [I]f X+Y=Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud had been committed.

14 F.3d at 654. The court went on to define fraud as requiring the "recognition of two elements: a misrepresented state of facts and a true state of facts." *Id.* at 655.

■ Contrary to Relators assertions, this Court finds that information exposing both the fraudulent transaction and the allegation of fraud have been publicly disclosed on several different occasions. The very essence of the fraud charges against IBM—that IBM had billed the government for leasing space in an office building it owned—was specifically mentioned by both Dingell and Thibault in their published remarks. Moreover, the details of IBM's alleged wrongdoing, including information regarding IBM's misclassification of its lease with Middlebrook Associates which enabled it to bill for costs otherwise not properly chargeable to the government, were provided to McDonnell Douglas in a report prepared by DCAA.

### B. "Based Upon"

■ Next, Relators claim that their complaint was not "based upon" information that had been publicly disclosed but rather on data discovered during their audit. The Fifth Circuit has not yet expressly defined the term "based upon". The other courts of appeals that have, however, with the exception of the Fourth Circuit, agreed, at least implicitly, that "based upon" should be interpreted to mean "supported by" or having a "substantial identity" with the prior public disclosures. *United States of America ex rel. D.J. Findley v. FPC–Boron Employees' Club, et al.*, 105 F.3d 675, 682–84 (D.C.Cir. 1997); *Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F.3d 562, 567 (11th Cir. 1994); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1158 (2d Cir.1993); *United States of America. ex rel. Precision Co. v. Koch Industries*, 971 F.2d 548, 552, 554 (10th Cir. 1992); *Houck on Behalf of United States*, 881 F.2d 494, 504 (7th Cir.1989). Recently, in *United States ex rel. D.J. Findley v. FPC–Boron Employees' Club, et al.*, the D.C.Circuit, in adopting the majority's definition of "based upon", found that the "background of Congress' repeated attempts to craft a qui tam provision that 'encourag[es] whistleblowing and discourag[es] opportunistic behavior'" supports the majority's "construction of the jurisdictional bar to encompass situations in which the relator's complaint repeats what the public already knows, even though [he]

had learned about the fraud independent of the public disclosures." 105 F.3d at 683 (quoting *Springfield*, 14 F.3d at 651) (citations omitted).

The Fourth Circuit, however, in *United States ex rel. Siller v. Becton Dickinson & Company*, found the majority rule to be inconsistent with the plain meaning of the phrase "based upon". 21 F.3d 1339, 1348 (4th Cir.1994). By referring to the dictionary definition of "based upon" which is "use as a basis for," the court determined that the term instead meant "derived from". *Id.* The Court then concluded that unless the qui tam plaintiff actually obtained his knowledge of the factual basis of his action from a public disclosure, such action could not be barred under § 3730(e)(4)(A). *Id.*

While the Fifth Circuit has not yet defined this term, it has tangentially addressed the issue in a recent opinion. In affirming the district court's dismissal of a qui tam plaintiff under § 3730(e)(4)(A), the Fifth Circuit, in *Federal Recovery Services, Inc. v. United States*, a decision rendered almost a year after *Siller*, found that the plaintiff, Federal Recovery Services ("FRS") complaint was "based upon" information that had previously been publicly disclosed. 72 F.3d 447, 451 (5th Cir.1995). The court simply concluded, citing to *Wang v. FMC Corp.*, 975 F.2d 1412, 1415 (9th Cir.1992), that "FRS's qui tam action [was] 'based on these public disclosures.' " *Federal Recovery Services*, 72 F.3d at 451. The Wang decision similarly fails to provide any explicit definition of "based upon". However, in discussing § 3730(e)(4)(B), the "original source" provision, the court held that if "someone *republishes* an allegation that already has been publicly disclosed, he cannot bring a qui tam suit, even if he had 'direct and independent' knowledge of the fraud. He is no 'whistleblower'. A 'whistleblower' sounds the alarm; he does not echo it." *Wang*, 975 F.2d at 1419 (emphasis in the original). Unquestionably, such a reading of the statute is inconsistent with the definition of "based upon" advanced by the *Siller* court encompassing only those claims that were actually "derived from" public disclosures.

Moreover, in addressing FRS's argument that its complaint alleged additional instances of fraudulent conduct by the defendant not previously publicly disclosed, the Fifth Circuit, quoting *United States ex rel. Precision Co. v. Koch Industries, Inc.*, 971 F.2d 548, 552 (10th Cir.1992) held that " 'an FCA qui tam action *even partly based upon* publicly disclosed allegations or transactions is nonetheless "based upon" such allegations or transactions.' " *Id.* (quoting *Precision*, 971 F.2d at 552) (emphasis in the original). In the sentence immediately preceding the above quoted language, the *Precision* court set forth its definition of "based upon", stating that "[a]s a matter of common usage, the phrase 'based upon' is properly understood to mean 'supported by.' " *Precision*, 971 F.2d at 552. Thus, while not precisely stated, it appears that the Fifth Circuit has, at least implicitly, adopted the *Precision* court's interpretation of "based upon".

Such a definition is also more consistent with the underlying objective of the FCA to strike an appropriate balance between encouraging private citizenry involvement in the government's battle against procurement fraud and prohibiting opportunism by barring suit brought by those who did not contribute anything significant to the exposure of fraud. In determining the meaning of any given statute, the Court must look " 'not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.' " *Springfield*, 14 F.3d at 654 (quoting *Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990)); *see Findley*, 105 F.3d at 682–3 (" 'A few words of general connotation appearing in the text of statutes should not be given a wide meaning, contrary to settled policy, excepting as a different purpose is plainly shown.' ") (quoting *United States v. American Trucking Ass'ns*, 310 U.S. 534, 544, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940)) (citations omitted). In so doing, this Court finds that the "language, structure, history and purpose of the FCA demonstrates that Congress sought to limit qui tam actions 'to those in which the relator has contributed significant independent information [that is not already in the public domain].' " *Findley*, 105 F.3d at 682 (quot-

ing *Springfield,* 14 F.3d at 653); *see also United States ex rel. Barth v. Ridgedale Elec. Inc.,* 44 F.3d 699, 702 (8th Cir.1995) (stating that the goals of the Act are to encourage "private citizen involvement in exposing fraud against the government while preventing opportunistic suits by private persons who became aware of the fraud but played no part in exposing it"); *Stinson,* 944 F.2d at 1154 ("One theme recurring through the legislative history in 1985 is the intent to encourage persons with firsthand knowledge of fraudulent misconduct to report fraud.").

When, as in this case, the government has been alerted to potential wrongdoing and in possession of all the information it needs to begin an investigation, qui tam actions brought by relators whose only contribution is to reinforce what the government already knows are unnecessary, resulting only in a reduction the Government's potential recovery. *See Springfield,* 14 F.3d at 654 ("When enough information exists in the public domain to expose the fraudulent transaction ... or the allegation of fraud ... the government itself presumably can bring an action under the FCA and there is no place in the enforcement scheme for qui tam suits."); *cf.* Vogel, *supra,* at 490 (discussing the percentage of recovery awarded the relator under the FCA as dependent upon the amount of new information provided by relator, demonstrating Congress' reluctance to equally reward relators who bring suits "based on information already publicly disclosed where only an insignificant amount of that information stemmed from that original source"); S.REP. No. 345, 99th Cong., 2d Sess. 1 ("The purpose of [the 1986 Amendments] is to enhance the Government's ability to recover losses sustained as a result of fraud against the Government."). The *Siller* court's definition would tolerate such suits in clear contradiction to Congress' intent to not share its recovery with a relator whose efforts are merely duplicative.

Furthermore, the *Siller* court's interpretation of "based upon" would render the "original source" exception superfluous. In order to qualify as an "original source", a relator must show that he has "direct and independent" knowledge of the fraud or facts form-

ing the basis of the asserted allegations of fraud and has voluntarily provided such information to the government prior to bringing suit. 31 U.S.C. § 3730(e)(4)(B). Independent knowledge has been defined as "knowledge that is not itself dependent on public disclosure." *Springfield,* 14 F.3d at 656. However, "if the relators's sole source is the public disclosure, it is impossible for the relator to have independently obtained information, because all the relator's information was obtained solely from the public disclosure." *United States ex rel. Rabushka v. Crane,* 40 F.3d 1509, 1528 (8th Cir.1994) (Magill, J., dissenting); *see also Findley,* 105 F.3d at 683 (finding that *Siller's* definition of "based upon" renders the "original source" provision largely superfluous). On the other hand, "using 'based upon' as a proxy for whether the relator's complaint merely parrots what is already in the public domain ... leads logically to a subsidiary inquiry into whether the relator had obtained the information in his complaint independently prior to the disclosure and so is an 'original source.' " *Findley,* 105 F.3d at 683. Thus, this Court declines to adopt, as urged by Relators, the *Siller* court's interpretation of "based upon" and will instead use the majority's definition set forth in *Precision.*

■■ Relators, in their amended complaint, assert the following:

> "Defendant, IBM, then leased and caused to be leased to itself the premises of this office building [the Bay Area Building] for purposes of its work on the [government] contracts in question. Thereafter (commencing in about 1986) IBM submitted to government agencies its lease costs for the premises in question as part of its annual indirect overhead submissions as well as in billing for progress and fee payments on the contracts in question.... These claims were false and fraudulent because they contained a claim for payment in excess of the amount actually owed." (First Amended Complaint, Instrument No. 35 at 3).

Without question, these charges have a "substantial identity" or are "supported by" the earlier allegations against IBM made by Dingell, Thibault, and disclosed to McDonnell Douglas by the DCAA in 1994. The Court

therefore finds that Relators complaint is "based upon" information that had been previously disclosed to the public. The Court will next determine whether Relators were "original sources" of that information and whether the required disclosures were made to the government prior to the initiation of this action.

### C. Original Source

As mentioned above, to qualify as an original source, the relator must show that he (1) "has direct and independent knowledge of the information on which the allegations are based" and (2) "has voluntarily provided the information to the Government before filing an action under the section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). "Direct" has been interpreted to require that the relator witness some aspect of the fraudulent activity himself or otherwise discover, through his own labor, the information underlying his allegations. *United States ex rel. Devlin v. State of California*, 84 F.3d 358, 361 (1996); *Springfield*, 14 F.3d at 656. "Independent" means knowledge that is not itself dependent on public disclosure. *Devlin*, 84 F.3d at 361. These requirements were "intended to bar parasitic suits through which a plaintiff seeks a reward even though he has contributed nothing significant to the exposure of fraud." *Devlin*, 84 F.3d at 362. Kuropata claims that he and Wercinski "have first hand knowledge of the 'lease cost' issue at the Bay Area building belonging to IBM and that they 'did not base [their] qui tam suit on any information [they] read in the newspaper or heard in Congress or anywhere else for that matter.'" (Relators' Memorandum of Law in Opposition to Defendant's Motion to Dismiss for Lack of Jurisdiction, Instrument No. 44, Kuropata Aff. ¶ 10).

However, although Kuropata may have been listed as the contact person on the three DCAA reports, it does not appear that either he or Wercinski actually conducted each of the audits. In fact, Kuropata himself testified that "[t]he original audit of IBM on the 'lease cost' issue at the 3700 Bay Area Building began in 1986 and was conducted by Auditor Butler." *Id.* at ¶ 4. Thus, Relators did not, at least initially, obtain knowledge of IBM's unlawful billing practices through their own labor, but rather learned it secondhand from Butler, who prepared the original audit report charging IBM with improper billing practices. *Barth*, 44 F.3d at 703 ("[A] person who obtains secondhand information from an individual who has direct knowledge of the alleged fraud does not himself possess direct knowledge and therefore is not an original source under the [FCA].").

Kuropata also testified that Butler, after repeated requests, was unable to acquire information from IBM "to legitimize its billing claims" nor did IBM "provide [Butler with the] statutorily required documentation to support its billings to the government." *Id.* at ¶ 5. Kuropata then stated that "[b]eginning in 1991 and in 1992, Bob Wercinski and I again sought to audit the 'lease cost' issue. However, we still did not receive [the] valuable records needed [from IBM]." *Id.* at ¶ 5. Kuropata concluded that "[b]ecause IBM has failed to provide the documentation required by statute to support its 'lease costs' claims, the only conclusion that one could possibly draw from the totality of the circumstances and from acceptable government accounting audit practice, is that evidence of probable fraud existed." *Id.* at ¶ 9. By Kuropata's own testimony, therefore, it is clear that no new evidence of fraud was discovered by Kuropata or Wercinski in their follow-up audits nor did they make any significant contributions to the exposure of fraud. *See Devlin*, 84 F.3d at 361 (stating that merely verifying the accuracy of information of fraud is insufficient to provide a relator with "direct" knowledge of wrongdoing).

Moreover, Relators disclosure to the government was not voluntary. Relators are salaried government employees, who, by the express terms of their employment as auditors, are compelled to disclose fraud. For example, the DCAA Contract Audit Manual ("DCAAM") outlining DCAA auditors duties provides that

[i]n determining contractor compliance with laws and regulations, government auditing standards require auditors to design audit steps and procedures to provide reasonable assurance of detecting errors, ir-

regularities, abuse, or illegal acts that could (1) have a direct (or indirect) and material effect on contractor financial representations or the results of financial-related audits or (2) significantly affect the audit objectives. Auditors should also exercise (1) due care in planning, performing, and evaluating the results of audit procedures and (2) a proper degree of professional skepticism to achieve reasonable assurances that material unlawful activities or improper practices are detected.

(Defendant's Memorandum in Support of its Motion to Dismiss for Lack of Jurisdiction, Instrument No. 39, Ex. 15).

In *U.S. Ex Re. Fine v. Chevron, U.S.A., Inc.*, the Ninth Circuit held that government employees, such as Relators, under duty to discover and report any wrongdoing, could not also "voluntarily", within the meaning of that term under the FCA, disclose such information to its employer, the government. 72 F.3d 740, 741 (9th Cir.1995). Specifically, the court stated that the "government employed [the plaintiff] to assist in its efforts to root out, disclose, and prevent fraud, and rewarded him with a salary and benefits" and as a result, the plaintiff "no more voluntarily provided information to the government than we, as federal judges, voluntarily hear argument and draft dispositions." *Id.* at 743–44, 745; *see also LeBlanc*, 729 F.Supp. at 176. (declining to permit a government employee, whose responsibility was to uncover fraud, to qualify as an "original source" because "the fruits of [the employee's] efforts belong to his employer–the government"). To hold otherwise would frustrate the underlying objective of the FCA of discouraging parasitic suits by opportunistic relators. The government employee bringing suit based on information acquired through his employment would be allowed to "profit from information already obtained at the taxpayer's expense. In other words, permitting former government employees to bring qui tam actions based upon information they discovered on the job would allow them to be paid twice for the same work. That is not what Congress had in mind." *Id.*

Moreover, there are several legitimate policy–based justifications for this conclusion.

First, qui tam monitoring by government employees having access to inside government information may effectively eliminate an enforcement agency's prosecutorial discretion. "[A]ccess to information which the government is uniquely able to collect and maintain ... permits the government employee to override the agency's decision not to prosecute...." William E. Kovacic, *Whistleblower Bounty Lawsuits as Monitoring Devices in Government Contracting*, 29 LOY. L.A.L.REV. 1799, 1844 (1996). Second, there would be great temptation for these employees to keep information of contractor misconduct to themselves, rather than provide it to the government, so that they may pursue a qui tam action and obtain a percentage of the government's recovery. Bullock, *supra*, at 383–84. Such a situation would create a serious conflict of interest for the employee between undivided loyalty to his employer and personal gain. Finally, government contractors, aware of the possibility for a qui tam action to be brought against by certain government employees, would be reluctant to "cooperate with government agencies in executing routine contract administration, oversight and auditing activities." Kovacic, *supra*, at 1835–36. For the foregoing reasons, therefore, this Court finds that Relators' disclosure of information regarding allegedly fraudulent conduct on the part of IBM was not "voluntary" within the meaning of the FCA. IBM's motion to dismiss will be granted.

## V. Conclusion

Accordingly, Defendant's Motion to Dismiss is **GRANTED**.